INTRE SPORT LTD., Plaintiff,

v.

KIDDER, PEABODY & CO.,
INCORPORATED,
Defendant.

85 Civ. 1968 (RWS).

United States District Court,
S.D. New York.

Dec. 23, 1985.

Rogers, Hoge & Hills, New York City, for plaintiff; Lynda G. Jacobs, William J. Foster, IV, of counsel.

Shanley & Fisher, P.C., New York City, for defendant; Matthew Farley, of counsel.

### OPINION

SWEET, District Judge.

Defendant Kidder, Peabody & Co., Inc. ("Kidder, Peabody") moves for an order of dismissal under Rule 12(b), Fed.R.Civ.P., or in the alternative, arbitration of the claims of plaintiff Intre Sport, Ltd. ("Intre Sport") which arise out of two sets of allegedly fraudulent transactions in securities. Kidder Peabody seeks the following relief: 1) dismissal of all claims alleged under section 12(2) of the Securities Act of 1933; 2) dismissal of the claim arising under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq* (hereinafter "RICO"); 3) compelled arbitration of all other claims, including any remaining RICO claims and implied causes of action under the federal securities laws; and 4) dismissal of the federal securities laws claims if they are not referred to arbitration. For the reasons set forth below, the motion to dismiss the claims under RICO and Section 12(2) of the Securities Act of 1933 is granted, and the remaining federal securities law and common law fraud claims are referred to arbitration.

### Prior Proceedings

Intre Sport filed this action on March 13, 1985, alleging claims arising under section 12(2) of the Securities Act of 1933, 15 U.S.C. § 77*l* (2), section 10(b) and 15(c) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78o(c) and various common law breaches of contract, breaches of fiduciary duty, and fraud.

Kidder, Peabody filed a motion seeking dismissal and arbitration of the initial complaint on May 3, 1985, and on August 13, 1985, Intre Sport filed both an opposing brief and an amended complaint, adding a claim under section 1964(d) of RICO. Kidder, Peabody withdrew its original motion, and on September 6, 1985 made a motion to dismiss the amended complaint, or alternatively, to submit all of Intre Sport's claims, except for those arising under section 12(2) of the Securities Act, to arbitration. For the convenience of the court, Kidder, Peabody consolidated all of its arguments in its September 1985 brief, superseding the earlier May 3, 1985 brief. Matters outside the pleadings and the memoranda of law have not been considered in deciding this motion, and it remains a motion to dismiss on the pleadings pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(c).

### The Parties

Intre Sport, formerly known as International Trends, Inc. ("International Trends") is a corporation duly incorporated in the State of New York, with its principal place of business at 350 Fifth Avenue, New York, New York.

Kidder, Peabody is a corporation with its principal place of business at 10 Hanover Square, New York, New York, and is a registered broker-dealer under section 15 of the Securities Exchange Act and is a

member of the National Association of Securities Dealers, Inc. ("NASD"), the New York and American Stock Exchanges and most major securities, options and commodities exchanges.

## The Pleadings

For the purposes of this motion, the facts as alleged in the complaint are accepted as true. In April, 1982, Robert J. Turner ("Turner"), President and Chief Executive Officer of International Trends (now Intre Sport), met Peter N. Brant ("Brant"), a Vice President of Kidder, Peabody employed at its 101 Park Avenue, New York City branch office, who introduced himself to Turner as a highly successful broker with Kidder, Peabody who insisted on complete discretion over his customer's accounts. Turner reported to Brant that his company maintained securities brokerage accounts at other investment firms and had substantial investments in the stock market. Brant told Turner that he never followed Kidder, Peabody's recommendations but instead "specialized in identifying small companies with significant growth potential" and that he was able to develop close confidential relationships with the management of these companies which enabled him to "obtain valuable information in advance of the public."

In April, 1982, Intre Sport opened a margin account with Kidder, Peabody and executed a standard Customers Agreement which provided in relevant part as follows:

> Any controversy arising out of or relating to accounts of or transactions with or for the undersigned or to this agreement or the breach thereof shall be settled by arbitration in accordance with the rules of either the American Arbitration Association or the New York stock Exchange as the undersigned may elect. If the undersigned does not make such election by registered mail addressed to you at your main office in New York City within five days after demand by you that such election be made, then you may make such election. Judgment upon any award rendered by the arbitrators may

be entered in any court having jurisdiction thereof.

Both Turner and Intre Sport's Executive Vice President Peter J. MacLeod ("MacLeod") were listed as having authority over the corporation's account.

Two sets of transactions are involved: Intre Sport's purchase of the stock of American Surgery Centers, and Brant's alleged failure to sell certain securities in January, 1984.

## American Surgery Centers Stock

In March, 1983, Brant purchased 25,000 shares of American Surgery common stock for Intre Sport's account, at a price of $6.4780 per share for a total investment of $161,950.00. Brant told Turner and MacLeod that he had extensive knowledge about American Surgery and that he was personal friends with and regularly contacted employees of the company, including Greg Michael, its Executive Vice President. By May of 1983, American Surgery's price per share had doubled to $12.875.

During this period of rapid increase in the value of the stock, Brant telephoned Turner and MacLeod with what he described as "a deal which will change your lifestyle." He explained that American Surgery was issuing an unregistered secondary offering of common stock. While the offering was already oversubscribed, Brant told Turner and MacLeod that since he had been instrumental in assisting the company in arranging for the sale, he would be able to obtain 25,000 shares at $4.00 for the Intre Sport account. Brant also told them he had discussed the issue with Kidder, Peabody but was being paid for his efforts by American Surgery, either through cash commissions or American Surgery common stock.

Familiar with both the risks and nature of a restricted offering, Turner expressed concern about investing $100,000 in a restricted stock. Allegedly, Brant reassured him that there was no reason for concern since he had an arrangement with the management whereby American Surgery would register the first 25% of the private placement issue within three months of the

offering; 50% by year end, and would register the balance of the offering "soon thereafter." Turner and MacLeod visited Brant at his office on or about May 12, 1983 and expressed concern about the restricted nature of the stock. Brant repeated his earlier representation that the company had agreed to register the securities in a very short period of time. He also predicted that the value of American Surgery shares would continue to rise to the point where they would be worth $16.00 per share by the time the restricted shares were freed for trading.

During the same meeting, Brant told Turner and MacLeod that they should not hesitate to invest in American Surgery stock because he had personally invested approximately $800,000 in the restricted offering and produced a check to this effect. Again, Brant repeated to Turner and MacLeod that he was close to the top management of American Surgery, and that they "were going to make a lot of money on the deal."

Brant gave Turner and MacLeod further assurances that "if there was ever any reason for concern about the company they would, in any event, be the first to know since he would receive such information in advance of the general public." In reliance on these representations, Turner and MacLeod agreed to purchase approximately $100,000 of the restricted stock.

The factual accounts of the parties diverge somewhat over the events surrounding the "Limited Offering Memorandum." Intre Sport contends that Brant filled out the name of the purchaser and the distribution date, and tore off the back pages of the document which contained financial information relative to the purchasers and to the subscription agreement. Brant then asked Turner and MacLeod to sign the subscription agreement as "a formality." Kidder, Peabody's memorandum of law is silent on this incident, other than to state that Turner and MacLeod signed the agreement.

The American Surgery restricted shares were never registered in 1983 as Brant promised, and are currently not saleable in the secondary (public) securities market. The price of the common stock plummeted from $14.25 per share in June, 1983 to $3.125 in February, 1984. From May, 1983 through February, 1984, Turner and MacLeod had numerous conversations about the declining value of the shares and the company's failure to live up to the registration commitments. Brant continued to assure them that American Surgery was financially sound, and that the drop in stock price had prompted the company to postpone registering the private placement. Brant also insisted that the company intended to register the stock as soon as the secondary market price improved, and Intre Sport continued to hold, as of February, 1984, the original 25,000 shares of publicly traded stock and the 25,000 shares of private placement stock.

In April, 1984, Turner and MacLeod read a series of newspaper articles in *The Wall Street Journal* indicating that the Securities and Exchange Commission was investigating Brant's activities. The following month, the two officers learned that an action was filed against Kidder, Peabody in this court entitled *Huang v. Kidder, Peabody*, No. 84 Civ. 1798 (S.D.N.Y.1984), alleging securities fraud in connection with the American Surgery private placement stock. Intre Sport then retained counsel to prosecute this action.

### The January 1984 Sell Orders

As the second component to its claim, Intre Sport alleges that Brant failed to liquidate certain securities in its account despite the fact that Turner and MacLeod gave clear and definite orders to sell the shares. In May, 1983, the equity in Intre Sport's Kidder Peabody account reached its highest level, $1,644,272.10, from its low of $28,750.00 in April, 1982. During the summer of 1983 several of the stocks began to decline in value and the equity began to fall. Turner and MacLeod had telephone conversations discussing these falling prices with Brant on numerous occasions from May, 1983 through September, 1983, in which they expressed their opinion that

Brant should consider liquidating the account before any more losses were incurred. Brant, by contrast, expressed confidence that the market would recover and urged them to hold their positions.

On or about October 13, 1983, Turner spoke to Brant over the telephone and allegedly instructed him to start selling nine of the twelve securities positions then open in the account. However, Brant failed to sell seven of the nine positions as instructed. During the months of November and December, 1983 there were several more telephone conversations between Turner, MacLeod, and Brant. Asked to explain his failure to sell as directed, Brant responded that he did not execute the orders because it would have caused a significant drop in the market price of the thinly traded stock, and would have caused harm to himself and his other customers maintaining substantial positions in the stock. Because of a slight recovery in two of the stocks, it was agreed that the sale of the seven positions in question would be postponed.

On January 26, 1984, Turner telephoned Brant and instructed him to sell six of the remaining securities positions at the market. Rather than selling the securities on January 26, as allegedly instructed, Brant sold the securities four to six days later. When Turner received the trade confirmation statements and learned that the securities had not been sold on January 26, 1984, he contacted Brant to demand an explanation. Brant acknowledged that he had disregarded Turner's instructions because he refused to sell when the market price was rapidly falling and a sudden sale would have further "destroyed" stock prices. As a result of this alleged failure to sell, Intre Sport claims to have sustained damages of $17,912.50.

Intre Sport alleges that this failure to sell "was part of a fraudulent scheme between Brant and others to avoid depressing the market further in each of the securities in question and to otherwise permit Brant

and other customers to sell the same securities at more favorable prices" and before Intre Sport could sell its shares.

**Discussion**

**The Civil RICO Claim**

Intre Sport claims that Brant and Kidder, Peabody violated section 1962(c) of the Racketeer Influenced and Corrupt Organizations Act, by engaging in a "pattern of racketeering activity," entitling Intre Sport to recover treble damages, the cost of suit, and reasonable attorney's fees under § 1964(c) which creates a private civil right of action under the statute. Section 1962(c) provides:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities which affect interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

Section 1961(5) defines a "pattern of racketeering" to include the commission of two or more specified predicate criminal acts within a ten-year period, including fraud in the sale of securities, and acts of mail and wire fraud under 18 U.S.C. § 1341 and § 1343. 18 U.S.C. § 1961(1)(A) and (D).

Kidder, Peabody claims that Intre Sport's civil RICO claim is defective because: 1) Kidder, Peabody cannot be named as both "person" or violator and "enterprise"; [1] 2) Kidder, Peabody is not a "person" who violated the requisite criminal predicate acts; and 3) Intre Sport has not pleaded the existence of a "pattern" of racketeering activity under the statute.

**"Enterprise" or "Person"**

Kidder, Peabody contends that Intre Sport must differentiate between an "enterprise" and "person" under section 1962(c), because the statute contemplates a violator who conducts his affairs through an enterprise. The Second Circuit in *Ben-*

---

1. An "enterprise" under section 1961(4) includes an individual, partnership, corporation, association, or any other legal entity, and any union or group of individuals associated in fact nor not a legal entity.

nett v. United States Trust, 770 F.2d 308 (2d Cir.1985) recently endorsed this requirement that "enterprise" and "person" be separate and distinct entities in a RICO claim under section 1962(c):

> ... requiring a complaint to distinguish between the enterprise and the person conducting the affairs of that enterprise in the prohibited manner is supported by the plain language of section 1962(c), which clearly envisions two entities. Moreover, requiring a distinction between the enterprise and the person comports with legislative intent and policy. Such a distinction focuses the section on the culpable party and recognizes that the enterprise itself is often the victim of the racketeering activity (citing cases). *Thus, we follow the majority view and hold that under section 1962(c) a corporate entity may not be simultaneously the "enterprise" and the "person" who conducts the affairs of the enterprise through a pattern of racketeering activity.*

*Id.* at 315 (emphasis added).

Intre Sport claims that *Bennett* does not control the situation at bar because "The circumstances and concerns which led the Second Circuit to its decision in *Bennett* are inapposite here, where the corporation, while cast as both the 'person' and the 'enterprise' was an active perpetrator of the fraud, and not a passive tool or instrument." (Plaintiff's supplemental memorandum, p. 10) However, this interpretation of the *Bennett* holding disregards both the line of cases endorsed by the *Bennett* court requiring the pleading of distinct "enterprise" and "person" under section 1962(c), and inaccurately describes the factual allegations contained in Intre Sport's amended complaint.

First, the holding in *Bennett*, emphasized above, was an endorsement of the Court of Appeals majority view that the language and intent of section 1962(c) requires this pleading distinction and was not limited to its own factual circumstance when no individual employee was named as a violator apart from the corporation. *Bennett v. United States Trust Co., supra,* 770 F.2d at 315 (and cases cited therein). Indeed, Intre Sport's argument that section 1962(c) should not be read to require the separation of enterprise and person when the corporation has actively participated in the fraud was addressed and rejected by the Seventh Circuit in *Haroco v. American Natl. Bank & Trust Co. of Chicago,* 747 F.2d 384 (7th Cir.1984), *aff'd on other grounds,* —— U.S. ——, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985), a case endorsed by the *Bennett* Court for its construction of section 1962(c):

> The Eleventh Circuit argued in [*United States v.*] *Hartley* [678 F.2d 961 (11th Cir.1982)] that where the defendant corporation is the central figure in a criminal scheme, as it was in that case, Congress could not have meant to let the perpetrator escape RICO liability while subjecting only the sidekicks to RICO's severe penalties. 678 F.2d at 989. ... In *Parnes,* Judge Shadur argued that it would make little sense to hold a corporation liable under RICO for the misconduct of lower level employees, at least where it appears that the corporation is a passive instrument or even a victim of the racketeering activity. [*Parnes v. Heinold Commodities*] 548 F.Supp. [20] at 23–24 [(N.D.ILL.1982)].

> •   •   •   •   •

> In our view, the RICO provisions have already taken into account these competing policies in different situations, and a careful parsing of section 1962 reveals a sensible balance among these policies ...

> In our view, the tensions between these powers may be resolved sensibly and in accord with the language of section 1962 by reading subsection (c) together with subsection (a). As we read subsection (c), the "enterprise" and the "person" must be distinct. However, a corporation-enterprise may be held liable under

subsection (a) when the corporation is also a perpetrator.[2] *Id.* at 401–402.

Further, Intre Sport has not alleged any facts which portray the company as "active perpetrator of the fraud," or which place Kidder, Peabody in the role of "central figure in the criminal scheme." *Id.* at 401. Although the amended complaint calls Brant a "vice president" of the company, Kidder, Peabody states that there are hundreds of such vice presidents at the company who function as registered account representatives and who are not involved in firm management. Furthermore, the amended complaint does not name a single officer at Kidder, Peabody who "aided and abetted" Brant in any of his dealings with Turner and MacLeod.

Many district courts have dismissed strikingly similar claims which name brokerage firms as both "enterprise" and "person" or violator of section 1962 because the plaintiffs could not allege that the firms actively participated in the misconduct of the employee and because the claims could not plead the firms as both "enterprise" and "person" under the statute. *Rush v. Oppenheimer,* No. 84 Civ. 3219 (Dec. 24, 1985 S.D.N.Y.) (Brokerage firm not a proper "person" under § 1962 because not an active participant in account executive's "churning" and not properly named as both "person" and "enterprise"); *Schofield v. First Commodity Corp. of Boston,* No. 83–4137–Z (D.Mass., April 29, 1985) (commodities firm cannot be named as person and enterprise under section 1962 when it did not participate in the commission of the predicate acts); *Dakis*

*ex rel. Dakis Pension Fund v. Chapman,* 574 F.Supp. 757 (N.D.Cal.1983) (Brokerage firm not actively engaged in the "churning" of employee registered representative and not properly named as both enterprise and person); *Parnes v. Heinold Commodities, Inc.,* 548 F.Supp. 20 (N.D.Ill.1982) (Commodities brokerage firm cannot be named as both person and enterprise under section 1962(c) for its employees' pattern of racketeering activity).

Intre Sport claims that Kidder, Peabody's vicarious liability for the acts of its employee Brant, makes it proper to name the company as a "person" or violator of the predicate criminal acts constituting a pattern of racketeering under section 1962. This argument has, however, been rejected by the majority of courts considering the issue, as it accomplishes an end-run around the required distinction between "enterprise" and violator of the statute, and uses concepts of civil vicarious liability to impute the responsibility for the criminal predicate acts of the employee onto the employer. As the Court stated in *Parnes v. Heinold Commodities Inc., supra,* 548 F.Supp. at 24 n. 9, "that sort of respondeat superior application, perhaps permissible to establish ordinary civil liability would be bizzare indeed as a means to warp the facts alleged in this case into the RICO mold. On that theory malefactors at a low corporate level could thrust treble damage liability on a wholly unwitting corporate management and shareholders." *Accord Rush v. Oppenheimer, supra,* No. 84 Civ. 3219 (Dec. 24, 1985 S.D.N.Y.); *Schofield*

---

**2.** Section 1962(a), a claim which Intre Sport has not alleged against Brant but against Kidder, Peabody, provides in relevant part:

**§ 1962. Prohibited activities**

(a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activi-

ties of which affect, interstate or foreign commerce. A purchase of securities on the open market for purposes of investment, and without the intention of controlling or participating in the control of the issuer, or of assisting another to do so, shall be unlawful under this subsection if the securities of the issuer held by the purchaser, the members of his immediate family, and his or their accomplices in any pattern or racketeering activity or the collection of an unlawful debt after such purchase do not amount in the aggregate to one percent of the outstanding securities of any one class, and do not confer, either in law or in fact, the power to elect one or more directors of the issuer.

*v. First Commodity Corp. of Boston, supra,* No. 83–4137–Z (April 29, 1985, D.Mass.); *Dakis ex rel Dakis Pension Fund v. Chapman, supra,* 574 F.Supp. at 759; *Haroco v. American National Bank & Trust, supra,* 747 F.2d at 402 n. 20 (there is no statutory grounds for asserting that respondeat superior liability differentiates civil from criminal RICO under § 1962(c) permitting a corporation to be both a defendant and enterprise under the statute). *Contra, Bernstein v. I.D.T. Corp.,* 582 F.Supp. 1079 (D.Del.1984); *Morley v. Cohen,* 610 F.Supp. 798 (D.Md.1985).

■ The same facts which indicate that Kidder, Peabody was not a "central figure" in Brant's alleged frauds would make criminal *respondeat superior* RICO liability for these frauds a "bizzare result" in this case. In short, Kidder, Peabody cannot be named as both "enterprise" and "person" under § 1962(c) and is not a proper defendant in this civil RICO claim. Because Intre Sport has failed to meet this threshold pleading burden, there is no need to reach the question of whether Intre Sport has established a "pattern of racketeering activity."

### The 12(2) Claim

Intre Sport also asserts a claim under section 12(2) of the Securities Act of 1933, 15 U.S.C. § 77*l* (2), which provides a private civil cause of action against persons who sell or offer to sell unregistered securities on the basis of misleading prospectuses or oral cummunications. Kidder, Peabody contends that Intre Sport's claim under section 12(2) for negligent untrue statements or omissions in the sale of the American Surgery stock must be dismissed because the claim is time-barred. Section 13, 15 U.S.C. § 77m, which sets the statute of limitations for section 12(2) violations, provides in relevant part: "No action shall be maintained to enforce any liability created under section ... 77*l* (2) of this title unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence ..." 15 U.S.C. § 77m. Because this action was filed more than one year after the May, 1983 sale, the question to be resolved is whether Turner and MacLeod should have discovered the allegedly fraudulent misstatements more than one year before the commencement of this action.

■ A claim under section 12(2) must affirmatively plead compliance with the statute of limitations contained in section 13, and must include a statement of the plaintiff's "due diligence" in seeking discovery of these untruths or omissions. *Hill v. Der,* 521 F.Supp. 1370, 1389 (D.Del. 1981). Kidder, Peabody claims that Intre Sport's pleading of compliance with this statute of limitations is defective as a matter of law, and Intre Sport contends that the question of reasonable diligence is one for the jury.

While the court in *Cook v. Avien, Inc.,* 573 F.2d 685 at 697 n. 27 (1st Cir.1978) noted that when a question of reasonable diligence arises it is normally for the jury to decide, other courts have acknowledged that "where it is clear that the defendants cannot, as a matter of law, refute the defendant's plea of limitations, summary judgment may be granted." (citations omitted) *Buder v. Merrill Lynch, Pierce, Fenner & Smith,* 644 F.2d 690 (9th Cir. 1981), *see also In Re Caesar's Palace Securities Litigation,* 360 F.Supp. 366, 377 (S.D.N.Y.1973) (further discovery was required before the court could rule on compliance with the statute of limitations in section 13). While the *Buder* court was determining that this question of fact would not preclude summary judgment in the context of an alleged violation of Rule 10b–5, this rule has been applied without distinction to questions of reasonable diligence in the section 12(2) context. *Hagert v. Glickman, Lurie, Eiger & Co.,* 520 F.Supp. 1028 (D.Minn.1981) (summary judgment is an appropriate vehicle for determining compliance with the statute of limitations, but summary judgment should be denied where there are issues of fact as to when the limitations period begins). Here there are no disputed facts which need further development, and Intre Sport's own

contentions in the amended complaint establish that the statute of limitations bars this claim. *Cf. Freschi v. Grand Coal Venture,* 583 F.Supp. 780 (S.D.N.Y.1984) (in extreme circumstances summary judgment is appropriate on the question of when the statute of limitations in a § 10(b) action begins to run).

According to Kidder, Peabody, Intre Sport should have been on notice of Brant's misrepresentations about the American Surgery stock when the company failed to register its stock by the end of 1983, as Brant had promised. Although Intre Sport does not contest that it bases the section 12(2) claim on Brant's alleged promise that the shares would be registered in 1983, Turner and MacLeod contend that this failure to register the stock did not alert them to Brant's alleged fraudulent misrepresentations because Brant engaged in continuing misrepresentations to lull the pair into inaction on their potential section 12(2) claim. According to Intre Sport, Turner and MacLeod fulfilled their "reasonable diligence" requirements by making repeated demands for an explanation from Brant, who met these inquiries with assurances that the failure to register the private placement shares was merely temporary, and that the shares would be registered as soon as the price of the publicly traded shares "stabilized."

■ To comply with the reasonable diligence standard, Intre Sport must show that it filed suit when the possibility of suit should have become apparent, *Ingenito v. Bermec Corp.,* 441 F.Supp. 525, 554 (S.D.N.Y.1977) and that it did not engage in "leisurely discovery of the full details of the scheme." *Hill v. Der, supra,* 521 F.Supp. at 1370, *citing Klein v. Bower,* 421 F.2d 338, 343 (2d Cir.1970).

As the First Circuit stated in *Cook v. Avien,* 573 F.2d 685, 698 (1st Cir.1978), "[T]he exercise of reasonable diligence requires an investor to be reasonably cognizant of financial developments relating to his investment, and mandates that early steps be taken to appraise those facts which come to the investor's attention. Al-

though this principle is particularly true when the non-disclosed facts are negligently omitted, even where facts are fraudulently withheld, a plaintiff cannot be allowed to ignore the economic status of his or her investment."

■ Intre Sport has failed to demonstrate that it appraised the facts which came to its attention about the American Surgery offering in a timely fashion. There are no factual disputes surrounding this issue. The misrepresentation which forms the basis of the section 12(2) complaint was Brant's alleged promise that by the end of 1983, the privately placed American Surgery stock would be registered and publicly tradeable. Intre Sport admits in its amended complaint that by the end of 1983 Turner and MacLeod knew this promise had been a misrepresentation because none of the shares had been so registered. Intre Sport thus had an obligation to act with reasonable diligence within a year of Brant's obvious failure to fulfill this registration promise.

■ Intre Sport's belief that the statute of limitations did not begin to run until the April, 1984 *Wall Street Journal* article on Brant's alleged insider trading activities is also unfounded because Turner and MacLeod knew by late 1983 that the American Surgery shares were not registered, and it was this knowledge of the untrue statement or omission which triggered the running of the statute of limitations. The fact that Brant persuaded Turner and MacLeod that "the company fully expected market conditions and the stock price to improve very shortly at which point the company would register the private placement stock" was not concealment of the failure to register the stock in 1983 but was an explicit admission of this misstatement. Intre Sport knew that none of the stock had been registered in 1983, and Brant's urging of a "wait and see" attitude as to the recovery of the stock price was not a concealment or a continuing misrepresentation but was a truthful acknowledgment that his promise that the stock would be fully tradeable by 1983 was false. The

strict statute of limitations in section 13 was meant to prevent plaintiffs from delaying action on potential section 12(2) claims as a hedge against the future lack of success of the unregistered shares:

> To hold otherwise would permit the securities acts to be used as havens for speculation and a buffer against any investment loss. When faced with knowledge of a company's serious financial difficulty, an investor cannot be allowed to wait for market increases knowing that if growth does not take place the securities acts will provide the insurance against loss.

*Cook v. Avien, supra,* 573 F.2d at 698. Because Intre Sport admits that it possessed knowledge of its potential section 12(2) claim in 1983, its section 12(2) claim is time-barred.

### Arbitration

Kidder, Peabody has moved for an order requiring Intre Sport to submit its federal securities claims to arbitration based on the signed Customer's Agreement, which calls for arbitration of any and all controversies relating to the account. Kidder, Peabody claims that the Supreme Court's recent opinion in *Dean Witter Reynolds, Inc. v. Byrd,* — U.S. —, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985) requires that Intre Sport's agreement to arbitrate be enforced even as to these federal securities claims. Intre Sport contends that the Court's analysis in *Byrd* does not alter current Second Circuit precedent holding federal securities claims non-arbitrable. However, the *Byrd* opinions' strong language casting doubt on the continued non-arbitrability of federal securities law claims, the Supreme Court's renewed vigor in enforcing agreements to arbitrate under the Federal Arbitration Act, and the significant differences between the implied private rights of action under the 1934 Act and the 1933 Act sections held non-arbitrable by the Supreme Court, I require that these federal securities claims must be referred to arbitration.[3]

The Federal Arbitration Act, 9 U.S.C. § 1 *et seq,* mandates that a federal or state court compel arbitration whenever the controversy at bar is referrable to arbitration under a contract "involving commerce," a fact which both parties concede in this action. Section 2 of the Act sets the standards for the enforceability of arbitration agreements:

> A written provision in any ... contract evidencing a transaction involving commerce to settle by Arbitration a controversy thereafter arising out of such contract of transaction or the refusal to perform the whole or part thereof, or an agreement in writing to submit to Arbitration an existing controversy arising out of such a contract, transaction or refusal, shall be valid, irrevocable, and enforceable, _____ upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. As the Supreme Court stated in *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.* 460 U.S. 1, 22 n. 27, 103 S.Ct. 927, 940 n. 27, 74 L.Ed.2d 765 (1983), the federal courts are obliged to grant a stay and order arbitration when the subject matter of the suit is referrable to arbitration, and the party applying for the stay is not in default in proceeding to such arbitration.

Intre Sport insists that federal securities law claims are exempted from the scope of the Federal Arbitration Act, and that the Supreme Court's opinion in *Dean Witter Reynolds, Inc. v. Byrd, supra,* — U.S. —, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985) does not alter this non-arbitrability. Intre Sport's position that 10(b) and 15(c) claims are non-arbitrable was the prevailing law of the Second Circuit prior to *Byrd. In Wilko v. Swan,* 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953) the Supreme Court held that an agreement to arbitrate disputes arising from a broker-dealer relationship cannot include arbitration of the plaintiff's 1933 Act Claim because enforcement of

---

**3.** Although the cases discussed herein do not explicitly refer to section 15 of the 1934 act, both parties agree that the arbitrability of this claim is governed by the same principles which govern arbitrability of section 10(b) claims.

that arbitration agreement would contravene the anti-waiver provisions of section 14 of the Securities Act of 1933. The Second Circuit, noting the strong policy in favor of resolving federal securities fraud questions in the federal courts, extended the *Wilko* doctrine to prevent compulsory arbitration of claims under section 10(b) of the 1934 Act. *Greater Continental Corp. v. Schechter*, 422 F.2d 1100, 1103 (2d Cir. 1970).

However, *Dean Witter Reynolds, Inc. v. Byrd, supra*, ── U.S. ──, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985), considered in conjunction with collateral developments restricting federal statutory exemptions from compulsory arbitration, dramatically alters the presumption of non-arbitrability of section 1934 claims.

In *Byrd*, the Supreme Court upheld the right of a brokerage firm to arbitrate the common law fraud claims of the plaintiff, despite the fact that they were "intertwined" with the plaintiff's non-arbitrable federal securities claims. While the Court declined to determine whether the plaintiff's section 10(b) claim was arbitrable, as it was not properly before the court, both the majority opinion and in particular Justice White's concurring opinion, cast doubt on the continued applicability of the *Wilko* doctrine to claims arising under the 1934 Act:

> "The premise of the controversy before us is that respondent's claims under the Securities Exchange Act of 1934 are not arbitrable, notwithstanding the contrary agreement of the parties. This court's opinion rightly concludes that the question whether that is so is not before us. *Ante*, at 1, n. 1. Nonetheless, I note that this is a matter of substantial doubt." *Id.* ──, 105 S.Ct. at 1244.

Justice White's *Byrd* analysis consisted of a comparison between the three statutory sections of the 1933 Act upon which the Court based its *Wilko* opinion, and their analogous sections in the 1934 Act, and concluded that "Wilko's reasoning cannot be mechanically transplanted to the 1934 Act." *Id.* The Court in *Wilko* based

the non-arbitrability of the section 12(2) 1933 Act claim on: 1) the existence of § 14 of the Act, the non-waiver provision; 2) section 12(2) of the Act, and its creation of a "special right to recover for misrepresentations which differs substantially from the common law action," and; 3) section 22 which provides concurrent state and federal jurisdiction for 1933 Act claims. *Wilko v. Swan*, 346 U.S. at 434–436, 74 S.Ct. at 186–187; 15 U.S.C. §§ 77n, 77*l* (2), 77v. Justice White, observing that only one of these provisions, the non-waiver clause, has a 1934 Act counterpart in section 29(a), 15 U.S.C. § 78cc(a), reiterated the Supreme Court's reasoning in *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 513–14, 94 S.Ct. 2449, 2454, 41 L.Ed.2d 270 (1974) where the Court first expressed reservations about extending the *Wilko* doctrine to 1934 Act claims:

> Wilko's reasoning cannot be mechanically transplanted to the 1934 Act. While § 29 of that Act, 15 U.S.C. § 78cc(a), is equivalent to § 14 of the 1933 Act, counterparts of the other two provisions are imperfect or absent altogether. Jurisdiction under the 1934 Act is narrower, being restricted to the federal courts. 15 U.S.C. § 77aa. More important, the cause of action under § 10(b) and Rule 10b–5, involved here, is implied rather than express. See *Herman & MacLean v. Huddleston*, 459 U.S. 375, 380 and nn. 9–10, [103 S.Ct. 683, 686 and nn. 9–10, 74 L.Ed.2d 548] (1983). The phrase "waive compliance with any provision of this chapter." 15 U.S.C. § 78cc(a) (emphasis added) is thus literally inapplicable. Moreover, Wilko's solicitude for the federal cause of action—the "special right" established by Congress, 346 U.S. at 431 [74 S.Ct. at 184]—is not necessarily appropriate where the cause of action is judicially implied and not so different from the common law action.

*Id.* ── U.S. at ──, 105 S.Ct. at 1244.

On the basis of this analysis that the 1934 Act did not contain the statutory indications for special exemption from the reach of the Federal Arbitration Act, Jus-

**1314**

tice White concluded that "the contrary holdings of the lower courts must be viewed with some doubt." *Id.*

Intre Sport contends that the private causes of action implied under the fraud provisions of the 1934 Act are different from the common law fraud remedies available prior to its enactment, and that they deserve the same solicitude as the *Wilko* Court extended to 1933 Act claims. To support this contention, Intre Sport points to the Court's opinion in *Herman & Mac-Lean v. Huddleston*, 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983), which recognizes that "the antifraud provisions of the securities laws are not co-extensive with common-law doctrines of fraud. Indeed, an important purpose of the federal securities statutes was to rectify perceived deficiencies in the available common-law protections by establishing higher standards of conduct in the securities industry." *Id.* at 388–89, 103 S.Ct. at 691. According to Intre Sport, there is no reason to have a lesser right to bring a cause of action implied from the statute rather than one specified in the statute.

However, this line of argument ignores the jurisprudential context of the *Byrd* opinion. The Court's observation that the anti-waiver provisions in section 29(a) do not extend to the implied rights of action under section 10(b) are significant because of the Supreme Court's recent attempt to make federal statutory causes of action arbitrable absent express Congressional intent to remove them from arbitration. This renewed emphasis on the paramount importance of the Federal Arbitration act is evident in *Moses H. Cone Memorial Hospital v. Mercury Construction Corp., supra,* 460 U.S. at 24–25, 103 S.Ct. at 941, where the Court stated: "Section 2 is a congressional declaration of a liberal federal policy favoring arbitration of agreements, notwithstanding any state substantive or procedural policies to the contrary. The effect of the section is to create a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act." ... "The arbitration act establishes that, as a matter of

federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *See also Development Bank of the Phillipines v. Chemtex Fibers, Inc.,* 617 F.Supp. 55 (per Weinstein, J.) (S.D.N.Y. 1985) (the Supreme Court has stressed that the Federal Arbitration Act establishes a strong preference for arbitration, which is to be given presumptive effect in doubtful cases).

The Court's recent opinion in *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* —— U.S. ——, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985) demonstrates this renewed commitment to the arbitrability of statutory claims. In *Mitsubishi,* the Supreme Court held that federal antitrust claims in the international context are fully arbitrable and enjoy no blanket or presumptive immunity from arbitration. The Court's explanation of how to construe the Federal Arbitration Act illustrates the weakness of Intre Sport's argument that even implied federal securities claims should be considered non-waivable under section 29(a) and should come under the rationale of *Wilko:*

> "Just as it is the congressional policy manifested in the Federal Arbitration Act that requires courts liberally to construe the scope of arbitration agreements covered by the Act, it is the Congressional intent expressed in some other statute on which the courts must rely to identify any category of claims as to which agreements to arbitrate will be held unenforceable ... we must assume that, if Congress intended the substantive protection afforded by a given statute to include protection against the waiver of a right to a judicial forum, that intention will be deducible from text or legislative history ..."

—— U.S. at ——, 105 S.Ct. at 3355.

■ Thus, the Supreme Court's emphasis on the requirement that Congress specify

which federal statutory claims are outside the scope of the Federal Arbitration Act is inconsistent with Intre Sport's belief that the *Wilko* doctrine should be extended to exempt even implied causes of action under the federal securities law, despite the fact that these remedies are not explicitly within the non-waiver provisions of the 1934 Act. This court joins the growing list of district courts which have interpreted the *Byrd* decision as a mandate for the arbitrability of 10(b) claims. *See e.g., Dees v. Smith Barney, Harris Upham & Co.,* No. 848676–PAR (July 31, 1985, C.D.Cal.); *Bateh v. Prudential Bache Securities, Inc., et al.,* No. 84–526–Civ–J–14 (July 29, 1985, M.D.Fla.); *Sevinor v. Merrill Lynch, Pierce, Fenner & Smith, et al.,* No. 84–3240–N (July 19, 1985, D.Mass.); *Finn v. Prudential-Bache Securities,* 610 F.Supp. 1079 (S.D.Fla.1985); *Coonly v. Rotan Mosle, Inc., et al.,* No. A–83–CA–529, (June 4, 1985, W.D.Tex.); and *Johnson v. Kidder, Peabody & Co., et al,* No. 85–CV–178 (July 30, 1985, N.D.N.Y.), *but see Jacobson v. Merrill Lynch, Pierce Fenner & Smith, et al.,* No. 84–1844 (April 22, 1985, W.D.Pa.); *Luce v. Edelstein,* [current] Fed.Sec.L.Rep. (CCH) ¶ 92,258 (S.D.N.Y.1985) (Retaining jurisdiction over 10(b) claim without reference to *Byrd*).

On the basis of the foregoing analysis, I hold that Intre Sport is required to submit both its common law fraud and 1934 Act claims to arbitration, pursuant to the Kidder, Peabody Customer's Agreement. Because Intre sport's 12(2) claim is barred by the statute of limitations, and its RICO claim is improperly pleaded, this action is hereby dismissed.

IT IS SO ORDERED.