■ NRT METALS, INC., Appellant, v LARIBEE WIRE, INC., et al., Defendants. LARIBEE WIRE, INC., et al., Counterclaim Plaintiffs-Respondents, v NRT METALS, INC., et al., Counterclaim Defendants-Appellants. — Order, Supreme Court, New York County (Seymour Schwartz, J.), entered July 8, 1983, unanimously reversed, on the law, to the extent appealed from, with costs, to grant plaintiff's motion for summary judgment dismissing defendants' second and third counterclaims for tortious interference with business relations and libel per se. ¶ Plaintiff NRT Metals, Inc. (NRTM) is a former dealer in metals and a former supplier of copper to wire manufacturers including defendant Laribee Wire, Inc., and several of its subsidiaries and affiliates (hereafter referred to collectively as Laribee). NRTM is presently in liquidation pursuant to a plan of voluntary liquidation approved by its general creditors in April, 1980. The underlying action between the parties is based on a claim by NRTM that Laribee failed to pay for goods sold and delivered, and repudiated its contractual obligations to NRTM under a commodity agreement for forward purchases of copper. ¶ The issue here arises from Special Term's denial of plaintiff's motion to dismiss two counterclaims by Laribee alleging tortious interference with business relations and libel. ¶ Beginning in January, 1978, the parties commenced a course of dealing in forward purchases of copper pursuant to an agreement which was never reduced to writing. Under the established procedure, James Holme, the NRTM vice-president in charge of the Laribee account, was in daily contact with Herman Rogge, Laribee's president, regarding the price and market outlook for copper. From time to time, when Rogge deemed the market factors favorable for purchase, he placed orders with Holme, based on the current Comex price, for physical copper to be delivered several months in the future. NRTM would then place a hedge on the transaction by purchasing one or more futures contracts on the Comex to protect its financial position in the event the price of copper went up between the date of the order and the date of delivery. After NRTM had executed the hedge purchases, it would confirm the forward sale in writing. Shortly before the delivery date, Rogge would specify Laribee's particular requirements with regard to the place of delivery, premium and shape of the copper, and a contract embodying the previously confirmed price and the additional terms would be sent to Laribee by NRTM. When the copper was finally ready for delivery, NRTM would notify the mill to release the metal to Laribee's account, and NRTM would invoice Laribee. ¶ On March 20, 1980 NRTM declared itself to be insolvent, and a plan of voluntary liquidation pursuant to section 305 of the Bankruptcy Code (US Code, tit 11) was adopted by NRTM's board of directors, and approved by NRTM's general creditors in April, 1980. Under the plan NRTM was to engage only in liquidating transactions, and was thereafter to distribute the remaining assets to the creditors. James P. Beggans, Jr., a member of the law firm representing NRTM prior to and during the liquidation proceedings and the instant lawsuit, was appointed liquidator. As of March 20, 1980, one of the forward pricing transactions (CS 884) had proceeded to the contract stage, i.e., Laribee had specified the required shape of the copper and the dates and place of delivery at Bayway, New Jersey. The first of three shipments under this contract had already been made to Laribee during the week commencing March 17. The industry practice was to require payment for metal shipments within 10 days of delivery, and the contracts in question so specified; however, under the parties' actual practice Laribee would pay 30 days after delivery and would be charged interest for the additional 20 days. ¶ NRTM did not deliver the remaining two 180,000-pound

copper shipments which were due the weeks of March 24 and March 31, 1980. NRTM explained this in an April 3, 1980 letter sent to Laribee by Mr. Beggans: ¶ "We herewith tender delivery in your favor for 360,000 lbs. Copper Wirebars as per our contract CS-884. ¶ "Under the terms of our contract payment is due in 10 days, however, pursuant to our verbal agreement that because your line of credit is above 1.5 million U.S. — dollars this payment must be received prior to release." ¶ On April 14, 1980 Mr. Beggans sent to Laribee on behalf of NRTM two contracts (CS 887 and CS 888) based on forward pricing agreements on March 13 and March 19, and tendered delivery on a net cash basis at a New York Commodity Exchange warehouse. By letter of April 18, 1980, Mr. Rogge rejected the tender of copper on the terms contained in the letters of April 3 and April 14. As a consequence of a dramatic drop in the price of copper between March 20 and April 18, 1980, and NRTM's inability to cover its substantial hedge position by executing the deliveries of copper to Laribee at the prices previously negotiated for future deliveries, NRTM allegedly lost approximately $1,000,000, and Laribee allegedly saved an equivalent amount by later purchasing its copper from other sources at the then prevailing lower price. ¶ Sometime after NRTM's general creditors approved the plan of voluntary liquidation in April, 1980, Mr. Beggans, as liquidator, prepared a memorandum for the creditors setting forth details of the aforesaid contractual dispute and concluding with his opinion that NRTM had a claim against Laribee for breach of contract. The Beggans memorandum was also sent to Mr. Rogge to give him an opportunity to prepare a responsive memorandum, which he did prepare, and which was sent by Mr. Beggans to the creditors for their consideration. On September 30, 1980, after considering the memoranda of Beggans and Rogge, the creditors decided to pursue NRTM's claim against Laribee. NRTM had also filed on June 4, 1980 a notice of claim under its credit insurance policy with the American Credit Indemnity Company of New York (ACI) regarding outstanding invoices to Laribee that were unpaid, in order to protect whatever rights NRTM and the creditors might have under the policy. ¶ On December 6, 1980 NRTM commenced an action against Laribee seeking damages and declaratory relief for failure to pay for goods sold and delivered, breach of a forward purchasing agreement, unjust enrichment and breach of an agreement to indemnify and hold harmless. ¶ Laribee counterclaimed against NRTM for prima facie tort, tortious interference with business relations, libel per se and malicious prosecution based upon the Beggans memorandum circulated to NRTM's creditors, and the filing of the insurance claim with ACI. NRTM's motion for summary judgment dismissing the counterclaim was granted only as to the counterclaims for prima facie tort and malicious prosecution. At issue on this appeal is the correctness of Special Term's determination that factual issues barred dismissal of the counterclaims for tortious interference with business relations and libel per se. For reasons that follow we conclude that those counterclaims also should have been dismissed. ¶ As conceded by Laribee, the rule is clear that damages must be pleaded and proved as an essential element of a cause of action for tortious interference with business relations. (See, e.g., *Israel v Wood Dolson Co.,* 1 NY2d 116, 120; *Diehl & Sons v International Harvester Co.,* 445 F Supp 282, 291; Interference — At-Will Relationship, Ann., 5 ALR4th 9, § 7.) We are unable to discern in the record evidence sufficient to raise a factual issue that Laribee sustained the required damages. (See *Morrison v National Broadcasting Co.,* 19 NY2d 453, 458.) Moreover, the record discloses no evidence of malice or the use of unlawful means by NRTM, proof of one or the other being necessary to sustain an action for interference with at-will business relationships. (*Harden, S.p.A. v Commodore Electronics,* 90 AD2d 733; *Rosenberg v Del-Mar Div.,* 56 AD2d 576; *Sommer v Kaufman,* 59 AD2d 843;

*Noah v Daitch & Co.,* 22 Misc 2d 649, 653.) On this issue, Laribee relies on an allegation in its verified counterclaim that "at a time and date in 1980 presently unknown, the liquidator advised a former employee of N.R.T. that he would take steps to 'embargo' Laribee Wire among its customers and suppliers in the electrical copper wire and cable industry". This vague allegation seems to us wholly insufficient to raise a factual issue. Moreover, excerpts from Mr. Rogge's deposition appearing at pages 72-73 of the record effectively refute the existence of any facts that would support a finding of malice by NRTM. ¶ Laribee also claims the existence of issues of fact as to whether the contracts in question were "fabrications" or "fictions", thus demonstrating malice and the use of unlawful means by NRTM. A legally significant presentation of the facts underlying this accusation is contained in the August 15, 1980 memorandum submitted by Mr. Rogge in response to the Beggans memorandum. He argues, in effect, that Laribee could not be deemed to have anticipatorily breached contract CS 884 because the contract calls for net 10-day terms, and thus urges that NRTM, by demanding net payment before delivery in its April 3, 1980 letter, was the breaching party. He does not, however, deny the existence of a prior verbal understanding that Laribee's credit to NRTM would not exceed $1.5 million, or that that dollar limit would have been exceeded had subsequent deliveries been made on credit. With regard to contracts CS 887 and CS 888, which accompanied the liquidator's April 14, 1980 tender of copper cathode deliveries against pricings made on the 13 and 19 of March, Mr. Rogge stated: "Those two contracts are totally false if they purport to represent any understanding between Laribee and NRT." ¶ We recognize the existence of factual issues affecting a determination as to whether the disputed contracts are legally binding obligations, depending on such factors as the particulars of the parties' forward pricing agreement, their course of dealing, and any understanding involving the purported credit limit to Laribee of $1.5 million. But factual issues regarding the ultimate contractual obligations of the parties are insufficient to raise a factual question on the existence of malice or the use of unlawful means by NRTM when it filed its claim with ACI, and when Mr. Beggans submitted his memorandum to the creditors. (See *Stillman v Ford,* 22 NY2d 48, 53-54.) ¶ With regard to the counterclaim of libel per se, we observe that a qualified privilege attached both to NRTM's communication with its insurance company (*Gallagher v Woodley Co.,* 35 AD2d 713) and the Beggans memorandum to NRTM's creditors by virtue of their common interest in the subject (*Stillman v Ford,* 22 NY2d 48, 53, *supra; Lovell Co. v Houghton,* 116 NY 520; Prosser, Torts [4th ed], § 115). Although the defense of qualified privilege would be overcome if NRTM had acted primarily out of motives of malice or ill will (*Shapiro v Health Ins. Plan,* 7 NY2d 56, 61; Prosser, *op. cit.,* § 115, pp 794-795), we have concluded, as discussed above, that Laribee has failed to set forth evidence of malice sufficient to defeat NRTM's motion for summary judgment, and therefore the motion should have been granted as to this counterclaim also. (*Kremer Constr. Co. v Garfinkel,* 31 AD2d 766.) We observe that if we were to hold otherwise, then nearly every qualifiedly privileged communication regarding breach of contract claims, however carefully worded, might well provide the basis for defamation counterclaims. (Cf. *Belsky v Lowenthal,* 62 AD2d 319, affd 47 NY2d 820.) Concur — Sandler, J. P., Asch, Silverman, Bloom and Kassal, JJ.