**VOLMAR DISTRIBUTORS, INC. and Interboro Distributors, Inc., d/b/a Media Masters Distributors, and Rez Associates, Inc., Plaintiffs,**

**v.**

**THE NEW YORK POST CO., INC., Maxwell Newspapers, Inc., El Diario Associates, Pelham News Co. Inc., American Periodical Distributors, Inc., Vincent Orlando, Newspaper and Mail Deliverers' Union of New York and Vicinity and Douglas La Chance, Defendants.**

No. 92 Civ. 2875 (WCC).

United States District Court, S.D. New York.

May 22, 1993.

---

Sylvor, Schneer, Gold & Morelli (Richard L. Gold, Iris S. Richman, of counsel) New York City, for plaintiffs.

Proskauer Rose Goetz & Mendelsohn (Claire P. Gutekunst, Elise A. Yablonski, of counsel), New York City, for defendants El Diario Associates, Pelham News Co., Inc., American Periodical Distributors, Inc. and Vincent Orlando.

Stroock & Stroock & Lavan (Bruce H. Schneider, William A. Rome, Richard S. Katz, of counsel), New York City, for defendant The New York Post Co., Inc.

## OPINION AND ORDER

WILLIAM C. CONNER, District Judge.

Plaintiffs Volmar Distributors, Inc. (Volmar) and Interboro Distributors, Inc. (Interboro) bring this action against The New York Post Co., Inc. (the Post), Maxwell Newspapers, Inc., publisher of *The Daily News*, (the News), El Diario Assoc. (El Diario), (collectively "the publisher defendants"); Pelham News Co., Inc. (Pelham), American Periodical Distributors, Inc. (American), (collectively "the distributor defendants"); Vincent Orlando (Orlando), the Newspaper and Mail Deliverer's Union (NMDU), and Douglas La Chance (La Chance) to contest plaintiffs' termination as distributors of *El Diario, The Daily News* and *The New York Post.* The complaint asserts violations of the Sherman Anti–Trust Act §§ 1 and 2, 15 U.S.C. §§ 1, 2, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, the New York State Donnelly Act, N.Y.Gen.Bus.Law § 340, and state common law claims for unfair competition, breach of contract, and tortious interference with contractual, pre-contractual, and business relationships. The action is presently before the Court on defendants' motion to dismiss.[1]

## BACKGROUND

The Post, the News, and El Diario are New York-based publishers of newspapers. Plaintiffs are independent non-unionized newspaper distributors in the New York metropolitan area, and they bring this action to contest their termination as distributors of *El Diario, The Daily News,* and *The New York Post* which occurred in late 1991 and early 1992. Compl. ¶¶ 38–45, 51–53. The facts alleged in the complaint are as follows:

There are three methods by which newspapers are distributed in the New York area. First, the newspaper publishers own and run their own distribution systems staffed by unionized drivers. In addition, there are independent unionized distributors, and independent non-unionized distributors who service those parts of the market which lack sufficient volume or are too geographically remote to attract a unionized distributor. Compl. ¶¶ 34, 35. All relevant unionized newspaper distributors, both independent and owned by the publishers, have collective bargaining agreements with the NMDU. Compl. ¶ 33(a) & (b).

The distributor defendants, like plaintiffs, are non-unionized newspaper distribution firms which are owned and controlled by Orlando. Defendant La Chance also has a beneficial interest in Pelham and American. Compl. ¶¶ 15, 16, 22, 23, 54. In May, 1991,

---

1. Defendants La Chance and NMDU make no submissions in support of this motion.

La Chance was elected president of the NMDU and soon thereafter Orlando and La Chance agreed to use La Chance's position in the union to expand the business of the distributor defendants. Compl. ¶ 46. To obtain distribution rights for the distributor defendants, La Chance offered labor concessions to induce the publisher defendants to cut off plaintiffs and give the distributorships to Pelham and American, compl. ¶ 50(b), and threatened the publisher defendants with labor strife if the transfers were not made. Compl. ¶ 112(a) & (b).

The publisher defendants transferred plaintiffs' distributorships to Pelham and American and claimed that the terminations were either mandated by their collective bargaining agreement with the NMDU, or the result of an independent business decision made for economic reasons. Compl. ¶ 110(d) (j) (k) (l). Plaintiffs bring this action to contest their termination.

## DISCUSSION

■ On a motion to dismiss we accept all allegations in the complaint as true, and dismiss only if it is clear from the face of the complaint that plaintiff is not entitled to relief. *See Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957); *Anderson v. Coughlin*, 700 F.2d 37, 40 (2d Cir.1983). For the reasons discussed below, we dismiss plaintiffs' federal and state antitrust claims and the common law claim for tortious interference with pre-contractual relationships. However, defendants' motion as to the remainder of the claims is denied.

### I. The Antitrust Claims

■ The complaint states claims for monopolization and attempted monopolization under § 2 of the Sherman Act, and for conspiracy in restraint of trade under § 1 of the Sherman Act against all defendants. 15 U.S.C. §§ 1, 2. Pursuant to each claim plaintiffs request treble damages and injunctive relief under §§ 4 and 16 of the Clayton Act. 15 U.S.C. §§ 15, 26. To recover under § 4 of the Clayton Act, a private plaintiff

must allege an "*antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." [2] *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977) (emphasis in original); *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990). Since the antitrust laws are intended to protect competition and not individual competitors, *Brunswick* 429 U.S. at 488, 97 S.Ct. at 697 to recover under the Clayton Act private plaintiffs must demonstrate that the injuries they suffered were caused by acts that had a competition-reducing effect. *Stamatakis Indus., Inc. v. King*, 965 F.2d 469, 471 (7th Cir.1992) (J. Easterbrook) (citing *Atlantic Richfield*); *Chicago Professional Sports Ltd. Partnership v. NBA*, 961 F.2d 667, 670 (7th Cir.1992) (J. Easterbrook) (same). The fact that defendants' behavior is alleged to be illegal *per se* under § 1 of the Sherman Act does not in any way diminish the requirement that plaintiffs show an *antitrust* injury.

> Conduct in violation of the antitrust laws may have three effects, often interwoven: In some respects the conduct may reduce competition, in other respects effects may increase competition, and in still other respects effects may be neutral as to competition. The antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from a competition-*reducing* aspect or effect of defendant's behavior. The need for this showing is at least as great under the *per se* rule as under the rule of reason.

*Atlantic Richfield*, 495 U.S. at 344, 110 S.Ct. at 1893 (emphasis in original).

In *Atlantic Richfield* the defendant-manufacturer vertically fixed a price ceiling among its distributors which the court assumed, for the purposes of its decision, to be illegal *per se* under § 1 of the Sherman Act. *Id.* at 335 n. 5. The plaintiff, a competing distributor who had lost sales due to the price ceiling, sued for treble damages under § 4 of the

---

**2.** A private plaintiff must also show an antitrust injury in order to receive injunctive relief under § 16 of the Clayton Act. *Cargill, Inc. v. Monfort*

*of Colorado, Inc.*, 479 U.S. 104, 111–13, 107 S.Ct. 484, 489–91, 93 L.Ed.2d 427 (1986).

Clayton Act. However, since defendants had not lowered prices to a "predatory" level, the plaintiff failed to establish that its losses sprung from some "competition-reducing aspect or effect" of defendants' behavior and, thus, failed to state an *antitrust* injury.

■ The complaint at issue states that defendants' conduct was designed to drive plaintiffs out of the relevant market. Compl. ¶ 50. However, these allegations describe the challenged conduct's effect only on plaintiffs, who are defendants' competitors, not its effect on the competitive structure of the market. The complaint makes the naked assertion that consumers and retailers of newspapers have been and will be deprived of the benefits of competition by defendants' actions. Compl. ¶ 57. However, this allegation fails to state adequately an antitrust injury because it is wholly conclusory and is unsupported by any of the facts alleged. *Jarmatt Truck Leasing Corp. v. Brooklyn Pie Co., Inc.,* 525 F.Supp. 749, 750 (E.D.N.Y. 1981) ("beyond its bald conclusion as to restraint of trade, the complaint fails to allege facts which show injury to *competition,* as distinct from injury to a *competitor* "); *Bustop Shelters, Inc. v. Convenience & Safety Corp.,* 521 F.Supp. 989, 997 (S.D.N.Y.1981) (injury to plaintiff insufficient to show antitrust injury, no description of competitive structure and how defendant affected that competition; consequentially complaint dismissed).

■ Plaintiffs attempt to distinguish *Atlantic Richfield* by arguing that the challenged behavior in that case was non-predatory while defendants' conduct in the instant case was intended to drive plaintiffs from the market. When used in the antitrust context, "predatory" behavior is a market concept and can not be inferred solely from one firm's exit from the industry. For example, predatory pricing occurs when a firm sets prices below its marginal costs thereby taking losses in the short run. The predatory firm hopes that similar losses will be experienced by its competitors prompting them to exit the industry. The ultimate goal of the predatory firm is to recoup its losses by raising prices after competition is diminished. *See generally, Kelco Disposal, Inc. v. Browning–Ferris Indus., Inc.,* 845 F.2d 404, 407–09 (2d Cir.1988), *aff'd,* 492 U.S. 257, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989). Therefore, to state a claim for predatory pricing, plaintiffs must include allegations of the relation between a competitor's prices and its marginal costs and not merely allegations that they were adversely affected by such prices. Similarly, in the instant case plaintiffs must allege more than the fact that they were terminated as distributors; they must plead facts that, if proven, would support a conclusion that their departure from the market had a competition-reducing effect.[3]

■ To allege an antitrust injury a private plaintiff must "show that its loss comes from acts that reduce output or raise prices to consumers." *Stamatakis,* 965 F.2d at 471 (J. Easterbrook) (citing *Atlantic Richfield* ); *Chicago Professional Sports,* 961 F.2d at 670 (J. Easterbrook) (same); *but see, Sunshine Cellular v. Vanguard Cellular Sys., Inc.,* 810 F.Supp. 486, 491–92 (S.D.N.Y.1992).[4] Plain-

**3.** The facts of *Atlantic Richfield* would be more effectively distinguished by pointing out that a non-predatory price ceiling has the pro-competitive effect of lowering prices to consumers. The instant complaint reveals no similar pro-competitive behavior. However, the holding of *Atlantic Richfield* is not limited to those actions that have a pro-competitive impact. The Supreme Court expressly required all private antitrust plaintiffs to show an antitrust injury in order to distinguish condemned anti-competitive behavior from conduct that has either a pro-competitive effect or is *neutral* as to competition. 495 U.S. at 344, 110 S.Ct. at 1893 (see language quoted above).

**4.** In *Sunshine Cellular,* defendant, a cellular telephone company, refused to enter into a "two-way roaming agreement" with plaintiff, a cellular telephone company with a license over the adjacent territory. The "roaming" agreement would have allowed customers of each company to use their cellular telephones when traveling in the territory of the other. Plaintiff argued that defendant's refusal to enter into the contract was an attempt to force plaintiff to sell its license to defendant. Defendant argued that even if it was able to displace plaintiff, competition would not be reduced because FCC regulations forbade any more than two cellular service providers in any one locale. Defendant concluded that plaintiff had not alleged an antitrust injury. The court rejected defendant's argument, relying largely on the Supreme Court's decision in *Otter Tail Power Co. v. United States,* 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973).

tiffs have not alleged that defendants' conduct has or will result in any retailer or consumer being in whole or in part denied service, receiving inferior service, or paying a higher price for services received. Having failed to allege any "competition-reducing aspect or effect" of defendants' conduct, plaintiffs can not claim that their injuries flowed therefrom. Since they fail to allege any *antitrust* injury, the antitrust claims are dismissed.[5]

## II. The RICO Claim

■ Plaintiffs assert a claim for violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962 subsections (c) and (d), against all defendants. Subsection (c) prohibits any person associated with an enterprise affecting interstate commerce from participating in its conduct through a pattern of racketeering activity, while subsection (d) prohibits conspiracies to violate the other RICO provisions.[6] 18 U.S.C. § 1962(c) & (d). Defendants argue that plaintiffs have not alleged the required "pattern of racketeering activity" which calls for a showing of at least two predicate acts within ten years. 18 U.S.C. § 1961(5).[7] We will first explore whether each predicate act is adequately pled and then discuss whether there are at least two violations alleged against each defendant. The predicate acts alleged by plaintiffs are wire and mail fraud, 18 U.S.C. §§ 1341, 1343; Taft–Hartley Act violations, 29 U.S.C. § 186 (prohibiting payments to labor representatives); and Hobbs Act violations, 18 U.S.C. § 1951 (prohibiting interference with interstate commerce by robbery, extortion, or violence to persons or property). Each will be discussed in turn.

We do not find *Otter Tail* instructive in the instant case. As shown in *Atlantic Richfield* and in the analysis above, the antitrust injury requirement is a burden placed on *private* antitrust plaintiffs by 15 U.S.C. §§ 15, 26. *Otter Tail* was a case brought by the *federal government* under 15 U.S.C. § 4, *United States v. Otter Tail Power Co.*, 331 F.Supp. 54, 56 (D.Minn.1971), and therefore, the court in *Otter Tail* was not in a position to construe the antitrust injury requirement. We rely on the more modern opinion in *Atlantic Richfield* which is directly on point.

5. Whether there is an antitrust injury under §§ 4 and 16 of the Clayton Act and whether an alleged violation of § 1 of the Sherman Act is *per se* illegal or subject to rule of reason analysis, are distinct issues which the parties confuse in their submissions. We acknowledge that the antitrust injury requirement, as enunciated in *Atlantic Richfield*, requires private plaintiffs to make a showing in some ways similar to the showing required under the Sherman Act § 1 rule of reason analysis. However, *Atlantic Richfield* is equally clear in its holding that the antitrust injury requirement exists separate and apart from the substantive requirements of the Sherman Act. We make this distinction to underscore that the antitrust injury requirement is a hurdle which all private plaintiffs must vault to gain access to antitrust relief, and therefore, we dismiss all plaintiffs' federal antitrust claims for their failure to allege an antitrust injury. Whether plaintiffs' § 1 Sherman Act claims would receive *per se* treatment would involve a complex analysis of *Klor's, Inc. v. Broadway–Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959) (concerted refusals to deal are a *per se* unreasonable restraint on trade under § 1 of the Sherman Act) and the subsequent cases which restrict the use of *per se* treatment to horizontal conspiracies. *See, e.g., Oreck Corp. v. Whirlpool*

*Corp.*, 579 F.2d 126 (2d Cir.), *cert. denied*, 439 U.S. 946, 99 S.Ct. 340, 58 L.Ed.2d 338 (1978). Even if we were to engage in this analysis, it would only be relevant to the four claims for relief under § 1 of the Sherman Act and would not dispose of plaintiffs' eight claims under § 2 of the Sherman Act. However, since the complaint fails to present an antitrust injury, we need not reach this issue.

Defendants additionally assert that the antitrust claims should be dismissed for their failure to adequately define the relevant market. Again, since the complaint fails to allege an antitrust injury, we need not reach this issue.

6. The relevant portion of the complaint reads as follows:

"The defendants, in conspiracy with one another, constituting an association in fact, have committed two or more acts prohibited by: [the wire and mail fraud statutes, the Taft–Hartley Act, and the Hobbs Act] and have participated in a racketeering enterprise, constituting a racketeering activity, which affects interstate commerce." Compl. ¶ 107.

Although the complaint fails to cite under which provision of RICO this action is brought, we find that this allegation is sufficient to state a claim under both subsections (c) and (d) of the RICO statute.

7. A RICO claim also requires that plaintiffs allege some interrelationship between the predicate acts. *Beauford v. Helmsley*, 865 F.2d 1386, 1391 (2d Cir.1988), *cert. denied*, 493 U.S. 992, 110 S.Ct. 539, 107 L.Ed.2d 537 (1989). However, since defendants do not argue that the complaint fails to state a sufficient relationship between the predicate violations alleged, we do not discuss this issue.

## A. Mail and Wire Fraud Allegations

The elements of mail fraud are: (1) a scheme to defraud (2) involving money or property and (3) use of the mails to further that scheme. *United States v. Wallach*, 935 F.2d 445, 461 (2d Cir.1991); *Michael Anthony Jewelers v. Peacock Jewelry, Inc.*, 795 F.Supp. 639, 652 (S.D.N.Y.1992).[8] Defendants make a two-pronged attack on plaintiffs' mail fraud claims. First, defendants argue that these allegations are not pled with the particularity required by Rule 9(b), Fed.R.Civ.P.. *Morin v. Trupin*, 711 F.Supp. 97, 111 (S.D.N.Y.1989) (when used as a predicate crime for a RICO claim, fraud allegations must be pled with particularity). Rule 9(b) requires that the complaint identify: the fraudulent statements made; how they were fraudulent; and when, where, and by whom they were made. *Cosmas v. Hassett*, 886 F.2d 8; 11 (2d Cir.1989). However, there is a recognized exception to this rule where the facts supporting a fraud claim are particularly within the defendant's knowledge. *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir.1987). In such cases plaintiff need only plead the facts upon which his belief is based. *Id.* Defendants' second contention is that plaintiffs have failed to allege the element of deception required to establish fraud. *McLaughlin v. Anderson*, 962 F.2d 187, 193–94 (2d Cir.1992) (to "defraud" under the mail fraud statute requires some element of deception). Plaintiffs describe a fraudulent scheme with several phases, each involving different subsets of defendants. We analyze each facet in turn to determine whether it is pled with the requisite particularity and whether a scheme to defraud is adequately put forth.

Plaintiffs claim that NMDU's 1991 election and La Chance's campaign therein were fraudulent because both La Chance and the union during the election stated that they would faithfully represent the union members when, in fact, they planned to grant labor concessions to obtain distribution rights for non-unionized distributors owned by La Chance and Orlando. Compl. ¶¶ 110(a) & (b), 46–49. The timing and fraudulent nature of these representations appear to be pled with sufficient particularity. Although the allegations, to an extent, fail to show precisely where and by whom the representations were made, this may be due to the fact that the actual proceedings are particularly within the knowledge of defendants La Chance and NMDU. However, since the purpose of Rule 9(b) is to protect defendants and enable them to answer, *see Cosmas*, 886 F.2d at 11, we need not reach whether these allegation comply with Rule 9(b) because defendants La Chance and NMDU do not join this motion.

La Chance's campaign for the NMDU presidency, and his behavior once in office, were sufficiently deceptive to constitute mail and wire fraud. *See United States v. Boffa*, 688 F.2d 919, 931 (3d Cir.1982), *cert. denied*, 460 U.S. 1022, 103 S.Ct. 1272, 75 L.Ed.2d 494 (1983) (scheme to defraud employees of loyal, faithful, and honest service from their union officials constitutes mail fraud).[9] However, the RICO statute only allows those plaintiffs "injured in [their] business or property by reason of a violation of section 1962" to sue. 18 U.S.C. § 1964(c). We note that the parties deceived by this portion of the scheme were not plaintiffs but the union members. However, to assert fraud as a predicate basis for a RICO claim, reliance on the part of the plaintiff need not be alleged. *See Shaw v. Rolex Watch U.S.A., Inc.*, 726 F.Supp. 969, 972–73 (S.D.N.Y.1989). Plaintiffs need only claim that "defendant's acts are a substantial factor in the sequence of responsible causation, and [that] ... the injury is reasonably foresee-

---

**8.** Since the elements necessary to establish their violations are essentially the same, the identical analysis is applied to both the mail and wire fraud allegations. *Carpenter v. United States*, 484 U.S. 19, 25 n. 6, 108 S.Ct. 316, 320 n. 6, 98 L.Ed.2d 275 (1987).

**9.** The Supreme Court overruled the Third Circuit's holding in *Boffa* that "intangible rights" could be property rights under the mail fraud

statute. *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987). However, Congress amended the statute and affirmed the reasoning in *Boffa*. 18 U.S.C. § 1346 (scheme or artifice to defraud includes a scheme or artifice to deprive another of the intangible right of honest services) (effective November 18, 1988).

able or anticipated as a natural consequence." *Standardbred Owners Ass'n v. Roosevelt Raceway Assoc.*, 985 F.2d 102, 104 (2d Cir.1993) (quoting *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 23–24 (1990)). The complaint states that defendants NMDU and La Chance fraudulently misused the union's power to force the transfer of distribution rights from plaintiffs to other non-unionized distributors. Surely the destruction of plaintiffs' businesses was causally related to and a foreseeable result of the alleged fraud upon the union's rank and file. Thus, these allegations adequately state mail and wire fraud as predicate acts to support the RICO claim against defendants NMDU and La Chance.

■ The complaint then contends that NMDU, La Chance, and the publisher defendants entered into a collective bargaining agreement which stated that the publishers would only deal with unionized distributors, compl. ¶ 110(e), and that these defendants falsely stated that this provision of the agreement was enforceable. Compl. ¶ 110(d). Although this allegation, at least as to the publisher defendants, is made with the particularity required by Rule 9(b), it fails to present the required element of fraudulent deceit. The alleged representations regarding the collective bargaining agreement did not induce plaintiffs to give up their distributorships, nor did the statements deceive anyone else. Therefore, although these terminations may have been a breach of contract or a violation of the Taft–Hartley Act, they do not constitute mail fraud. *See McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc.*, 904 F.2d 786, 792 (1st Cir.), *cert. denied*, 498 U.S. 992, 111 S.Ct. 536, 112 L.Ed.2d 546 (1990) (alleged kickbacks in violation of federal law were not deceptive because they did not induce plaintiff to give up its exclusive dealership).

■ Most of the other mail fraud allegations suffer from the same failure to plead the requisite element of deception. The complaint states that the Post and the News created false business records so that they might justify terminating plaintiffs' distributorships for business reasons, compl. ¶ 110(j), and that the publisher defendants falsely stated that the terminations were initiated by NMDU or made for economic purposes. Compl. ¶ 110(k) (*l*) & (m). There is no suggestion, however, that plaintiffs or anyone else was deceived by these false business records or the false justifications for termination. Therefore, they do not constitute mail fraud. Similarly, plaintiffs claim that their termination was made via the mails, compl. ¶ 110(i) & (k), and that the publisher and distributor defendants used the mails to place orders and pay for newspapers once the distributorships were transferred, compl. ¶ 110(g) (h) but here, too, there is no allegation of deception.[10]

■ The only fraud allegation against a publisher defendant which includes the requisite element of deceptive behavior is the claim that El Diario fraudulently obtained valuable distribution lists from plaintiffs, before their termination, by falsely representing that the information was required to audit the publisher's business. Compl. 110(f). This allegation complies with Rule 9(b) because it contains particulars as to who perpetrated the fraud, how and when. Compl. 110(f)(i). Thus, this portion of the complaint adequately states a mail fraud predicate act in support of the RICO claim against El Diario.

In sum, the complaint properly states mail and wire fraud predicate acts against NMDU, La Chance, and El Diario, but no such claim is set out against the other defendants.

**B.** The Taft–Hartley Act Allegations

As predicate acts for their RICO claim, plaintiffs allege violations of the Taft–Hartley Act which prohibits payments by employers

---

**10.** Plaintiffs cite our decision in *Patrick Carter Assoc.*, 1990 WL 195993 (S.D.N.Y.1990), in which we held that the uses of the mails need only be a "step in the [fraudulent] plot" to support a mail fraud claim. *Id.* at *3. However, defendants do not claim that the mails or wires were not used in the alleged fraudulent plot; they only claim that they did not deceive anyone with their use of the mails. Thus, our holding in *Patrick Carter Assoc.* is not inapposite to our holding here.

to labor representatives. 29 U.S.C. § 186.[11] The complaint states that the publisher defendants transferred valuable distribution rights directly or indirectly to La Chance, an officer of the union representing their workers, and that La Chance accepted these payments.[12] Compl. 111(a) & (b).

 The Post argues that this Taft–Hartley claim should fail because La Chance's interest in the distributor defendants is not set out with sufficient particularity, and therefore, the complaint does not allege that the transfers of distributorships to Pelham and American constituted payments to La Chance. However, a Taft–Hartley claim need only comply with Rule 8, Fed.R.Civ.P., which requires a complaint to contain only a short plain statement that the pleader is entitled to relief. *See United States v. District Council of New York City and Vicinity United Bhd. of Carpenters and Joiners of Am.,* 778 F.Supp. 738, 747 (S.D.N.Y.1991). We find that the allegation

**11.** The Taft–Hartley Act states in relevant part:
(a) It shall be unlawful for any employer.... to pay lend or deliver or agree to pay lend or deliver, any money or other thing of value—
(1) to any representative of any of his employees ...
(2) to any labor organization, or any officer or employee thereof, which represents, seeks to represent, or would admit to membership, any employees of such employer ...

(4) to any officer or employee of a labor organization ... with intent to influence him in respect to any of his actions, decisions, or duties as a representative of employees or as such officer or employee of such labor organization.
(b) ...
(1) It shall be unlawful for any person to request, demand, receive, or accept, or agree to receive or accept, any payment, loan, or delivery of any money or other thing of value prohibited by subsection (a) of this section.

**12.** The complaint also alleges that the distribution rights were paid to La Chance by Pelham, American and Orlando. Compl. ¶ 111(b). However, as stated below, payments by Pelham, American, and Orlando to La Chance do not state a Taft–Hartley violation because the complaint does not claim that these entities were willfully acting on behalf of the employer defendants.

**13.** The complaint alleges "Defendant La Chance has a direct or indirect beneficial interest in [Pelham and American] as an owner, employee,

of La Chance's beneficial interest in the distributor defendants meets this threshold.[13]

 The Post also argues that this charge fails to establish a willful violation of the Taft–Hartley Act.[14] A Taft–Hartley violation occurs when an employee representative knowingly receives something of value with the knowledge that it is being given by an employer, or an employer makes such a payment knowing it is being made to a labor representative. *See United States v. Ricciardi,* 357 F.2d 91, 100 (2d Cir.), *cert. denied,* 384 U.S. 942, 86 S.Ct. 1464, 16 L.Ed.2d 840 (1966). Plaintiffs claim that there was a conspiracy between the publisher defendants and La Chance to exchange these distribution rights for labor concessions, compl. ¶¶ 50, 50(b), which indicates that both parties knew of the other's status as employer or union official. Thus, the allegations set out Taft–Hartley violations against La Chance and the publisher defendants which support the RICO claim.[15]

consultant or in other capacities or ways not presently known to the plaintiffs." Compl. ¶¶ 22, 23.

**14.** Plaintiffs' counsel erroneously argues that a misdemeanor violation of the Taft–Hartley Act does not require a "willful" action by defendants. The relevant provision states:

(2) ... *[A]ny person who willfully violates this section* shall, upon conviction there of, be guilty of a felony and be subject to a fine of not more than $15,000, or imprisoned for not more than five years, or both; but if the value of the amount of money or thing of value involved in any violation of this provision of this section does not exceed $1,000, *such person* shall be guilty of a misdemeanor and be subject to a fine of not more than $10,000, or imprisoned for not more than one year, or both. 29 U.S.C. § 186(d)(2) (emphasis added). We find that "such person" in the second clause of this provision refers to "any person who *willfully* violates this section" in the first clause, and therefore, a willful violation must be alleged to show a felony or misdemeanor violation of the Taft–Hartley Act.

**15.** Plaintiffs also allege that the distributorships were transferred with the intent to influence La Chance in the execution of his duties, compl. ¶ 111(f). This constitutes a violation of subsection (a)(4) of the Taft–Hartley Act against the publisher defendants and La Chance. *See* 29 U.S.C. § 186(a)(4).

■ The complaint next states that Pelham, American, and Orlando paid consideration in the form of money, and a beneficial interest in distributors American and Pelham, to La Chance. Compl. ¶ 111(c). However, the Taft–Hartley Act only prohibits payments by employers or entities working on behalf of employers to labor representatives.[16] The complaint does not allege that Pelham, American, and Orlando willfully made these payments on behalf of the employer defendants. To the contrary, the scenario described in the complaint is more consistent with the contention that Pelham and American were agents of a union official since La Chance had a beneficial interest in the distributors. Thus, any payments by Orlando or the distributor defendants to La Chance did not violate the Taft–Hartley Act.[17]

■ Plaintiffs further enumerate a myriad of other undefined payments in violation of the Taft–Hartley Act which they do not allege to be connected with the termination of their distributorships. Compl. ¶ 111(d)(e) & (g).[18] Although some of these claims may adequately state a Taft–Hartley violation against several defendants, the complaint does not allege that these violations caused or indeed had any connection to plaintiffs' losses. Since plaintiffs have not alleged that

their losses were caused by or a foreseeable and natural consequence of these bribes, they have no standing to assert these violations as predicate acts for their RICO claim. *Standardbred,* 985 F.2d at 104.[19]

**C. The Hobbs Act Allegations**

■ As predicate acts for their RICO claim, plaintiffs assert violations of the Hobbs Act, which prohibits interference with commerce through extortion, robbery, or violence to person or property or attempts, conspiracies or threats of same. 18 U.S.C. § 1951(a).[20] "Extortion" is defined as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear or under color of official right." 18 U.S.C. § 1951(b)(2). The complaint states that La Chance and NMDU used threats of labor unrest to obtain distribution rights from the publisher defendants and compel their transfer to the distributor defendants. Compl. ¶ 112(a) & (b). Therefore, the complaint states a Hobbs Act violation against the union and La Chance. In addition, Pelham, American, and Orlando are alleged to have conspired with La Chance to extort distribution rights from the publisher defendants, compl. ¶ 112(c), and the facts surrounding the conspiracy are adequately set out in the com-

16. Nor are there any allegations that NMDU seeks to represent, or would admit to membership, employees of Pelham and American in which case the Taft–Hartley Act would have prohibited payments by the distributor defendants to La Chance. *See* 29 U.S.C. § 186(a)(2).

17. Plaintiffs argue that the Taft–Hartley Act prohibits bribing union officials through middlemen of either the union or management. *United States v. Lanni,* 466 F.2d 1102, 1108 (3d Cir. 1972) ("Read together [the Taft–Hartley Act] express[es] an intention to forbid indirect union official-management bribery, be it through the middleman of the official or of management"); *United States v. Carlock,* 806 F.2d 535, 555 (5th Cir.1986), *cert. denied,* 480 U.S. 950, 107 S.Ct. 1613, 94 L.Ed.2d 798 (1987). However, the complaint does not allege that American, Pelham and Orlando violated the Taft–Hartley Act by willfully *accepting* the distributorships from the employer defendants on behalf of La Chance. Although such an allegation might have stated a Taft–Hartley violation against these defendants, plaintiffs may not amend their pleadings through their motion papers.

18. These include demands by La Chance for consideration from the Post, compl. ¶ 111(d); "kickbacks" paid by the News to La Chance and/or Pelham, American, and Orlando, compl. ¶ 111(e); and payments by the Post, Pelham, American, and/or Orlando to the union's welfare and pension funds. Compl. ¶ 111(g).

19. However, plaintiffs do have standing to contest the transfer of *their* distribution rights as a Taft–Hartley violation because their loss was caused by, and a foreseeable result of, these alleged bribes. *See id.*

20. The relevant portion of the Hobbs Act states:

(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

plaint. Compl. ¶¶ 49, 50. Thus, a Hobbs Act violation against these defendants is also established in the complaint.

Plaintiffs also allege that all publisher defendants aided and abetted and/or conspired to transfer distribution rights in exchange for unlawful labor concessions. Compl. ¶ 112(d). The complaint does not delineate any additional violent or coercive behavior on the part of the publisher defendant,[21] but only claims that the publisher defendants participated in La Chance's extortion. However, La Chance is accused of extorting distribution rights *from the publishers*. An allegation that these publishers conspired in their own extortion does not state a violation of the Hobbs Act.[22] Therefore, a Hobbs Act violation is alleged as a predicate act for the RICO violation only against La Chance, NMDU, Pelham, American, and Orlando.

### D. A Pattern of Racketeering Activity

Defendants argue that plaintiffs' RICO claim should be dismissed because the complaint fails to establish at least two predicate acts against each defendant to constitute the requisite "pattern of racketeering activity" under RICO. 18 U.S.C. §§ 1962(c) & 1961(5). We find that the complaint states a RICO claim against all defendants.

La Chance is alleged to have committed mail and wire fraud, Taft–Hartley violations, and Hobbs Act violations. Moreover, since La Chance is alleged to have accepted bribes from each of the three publisher defendants, at least three Taft–Hartley violations are listed against La Chance, and since each publisher was alleged be the victim of La Chance's extortion, three Hobbs Act violations are alleged as well. See *Friedman v. Arizona World Nurseries Ltd. Partnership*, 730 F.Supp. 521, 547 (S.D.N.Y.1990), *aff'd*, 927 F.2d 594 (2d Cir.1991) (securities fraud perpetrated against seventy different people stated seventy predicate acts). Similarly, NMDU is alleged to have committed

mail and wire fraud and extortion in violation of the Hobbs Act against the three publisher defendants. Furthermore, Orlando, Pelham, and American are alleged to have conspired to extort distribution rights from the three publisher defendants, and El Diario is alleged to have committed mail and wire fraud against both plaintiffs, and bribed La Chance in violation of the Taft–Hartley Act. Therefore a "pattern of racketeering activity" has been alleged against all these defendants.

The Post and the News present a more troubling case. The only predicate acts that are alleged against these defendants are that each paid bribes to La Chance in the form of distribution rights transferred from Volmar and Interboro to Pelham and American in exchange for labor concessions. There is a question whether these transfers constitute one or two payments in violation of the Taft–Hartley Act. It is unclear from the complaint whether each distributorship was separately transferred for a distinct bundle of labor concessions or whether both distributorships were combined in one bribe to La Chance. See compl. ¶¶ 50(b), 111(a). The Post simultaneously terminated both Volmar and Interboro's distributorships on February 3, 1992, while the News simultaneously transferred both plaintiffs' distributorships on December 16, 1991. Although this lends support for the contention that both transfers constituted one bribe, we are reluctant to rely solely on the temporal proximity of the transfers to make such a holding. See *United States v. Kaplan*, 886 F.2d 536, 541–42 (2d Cir.1989), *cert. denied*, 493 U.S. 1076, 110 S.Ct. 1127, 107 L.Ed.2d 1033 (1990) ("temporal proximity of like acts for similar purposes against a number of victims does not require that two or more acts be counted as one"). Pursuant to this motion to dismiss we must draw from the complaint all reasonable inferences in plaintiffs' favor. *Murray v. City of Milford*, 380 F.2d 468, 470 (2d Cir.1967). Thus, we are persuaded by the fact that two distributorships were terminated and two

---

**21.** For example there is no allegation that the publisher defendants coerced the union into granting the alleged labor concessions.

**22.** The complaint also charges that the Post conspired with other defendants to induce, by threats of physical violence, the transfer of the Post's distribution rights. Compl. ¶ 112(c). This allegation suffers from the same flaw.

distributorships were created, and find that these transfers constituted two payments to La Chance in violation of the Taft–Hartley Act. If there are facts which show that these transfers constituted one bribe by each publisher, the Post and the News·may present them to the Court on a motion for summary judgment. However, for the purposes of the present motion, we find that the complaint alleges a pattern of racketeering activity against the Post and the News as well as the other defendants.

### E. The Conspiracy To Commit RICO Violations

■ The complaint also states a claim for a conspiracy to violate RICO under 18 U.S.C. § 1962(d). Plaintiffs argue that their allegation that all defendants conspired to commit each predicate act creates a broad list of violations to support this claim against each defendant. However, plaintiffs' counsel fails to recognize the distinction between a conspiracy which serves as a predicate violation for a RICO claim under subsection (c), and a conspiracy to violate RICO under subsection (d).

■ A conspiracy to commit a predicate act may itself serve as a predicate act under RICO if the violation is one of those enumerated in 18 U.S.C. § 1961(1)(A) or (D), but a conspiracy to commit a violation listed in 18 U.S.C. § 1961(1)(B) or (C) may not constitute a predicate act to support a RICO violation. *See United States v. Ruggiero,* 726 F.2d 913, 918 (2d Cir.), *cert. denied,* 469 U.S. 831, 105 S.Ct. 118, 83 L.Ed.2d 60 (1984) (although the language of § 1961(1)(A) allows for conspiracies to violate the provisions therein to serve as a predicate act for a RICO claim, that language is conspicuously omitted from

§ 1961(1)(B) & (C)); *United States v. Weisman,* 624 F.2d 1118, 1123–24 (2d Cir.), *cert. denied,* 449 U.S. 871, 101 S.Ct. 209, 66 L.Ed.2d 91 (1980) (to the same effect). It is unclear whether the complaint actually claims that defendants conspired to commit mail fraud, wire fraud, and Taft–Hartley violations, but even if it had, such conspiracies may not be predicate acts for a RICO claim because they are listed in 18 U.S.C. § 1961(1)(B) & (C).[23]

■ In the context of a conspiracy to violate RICO under 18 U.S.C. § 1962(d), "conspiracy" is narrowly defined. To state a RICO claim under subsection (d), plaintiffs must establish that each defendant agreed *personally* to commit at least two predicate acts. *United States v. Teitler,* 802 F.2d 606, 612–13 (2d Cir.1986); *Ruggiero,* 726 F.2d at 921. The complaint contains sufficient support for a finding that each defendant agreed to commit every predicate act that he is alleged to have actually committed. Therefore, the conspiracy to violate RICO claim is upheld. However, plaintiffs are mistaken in their assertion that additional conspiratorial predicate acts serve as a basis for this allegation.

### III. The State Law Claims

■ In addition to the federal claims, the complaint makes thirteen claims for relief under state law. Each plaintiff states a breach of contract claim against each publisher. In addition, both plaintiffs assert claims for tortious interference with contractual and pre-contractual relationships; tortious interference with existing and prospective business relationships; and unfair competition·against NMDU, La Chance, Pelham, American, and Orlando.[24] No defendant

---

**23.** Despite the fact that violation of the Hobbs Act is listed as a potential predicate act under 18 U.S.C. § 1961(1)(B), the Hobbs Act itself prohibits conspiracies. *See* 18·U.S.C. § 1951. Therefore, as stated above, the allegation that Orlando and the distributor defendants conspired to extort the distributorships states a Hobbs Act violation to support the RICO claim against these parties.

**24.** Additionally, plaintiffs assert four claims under the New York State antitrust laws involving all defendants. Donnelly Act, N.Y.Gen.Bus.Law

§ 340. "The Donnelly Act—often called a 'Little Sherman Act'—should generally be construed in light of Federal precedent and given a different interpretation only where State policy, differences in statutory language or the legislative history justify such a result." *Anheuser–Busch, Inc. v. Abrams,* 71 N.Y.2d 327, 335, 525 N.Y.S.2d 816, 820, 520 N.E.2d 535, 539 (1988). New York State adopted § 4 of the Clayton Act in § 340(5) of the Donnelly Act. *Lerner Stores Corp. v. Parklane Hosiery Co.,* 86 Misc.2d 215, 217–19, 381 N.Y.S.2d 968, 969 (Sup.Ct. Monroe County), *aff'd,* 54 A.D.2d 1072, 388 N.Y.S.2d 760 (4th

moves for the dismissal of the unfair competition claim; the other claims are each addressed in turn.

### A. Breach of Contract

 Both plaintiffs claim to have had long-term oral contracts with each of the publisher defendants, which did not permit cancellation "except for cause", compl. ¶ 55, and the complaint asserts that the publisher defendants breached these agreements by terminating plaintiffs' distributorships without proper notice and without cause. Compl. ¶¶ 123, 128, 133, 143, 148, 153. The publisher defendants argue that any such contract would be void under the New York statute of frauds which invalidates unwritten agreements that "[b]y [their] terms [are] not performed within one year from the making thereof ..." N.Y.Gen.Oblig.Law § 5–701(a)(1).

 "[A]n oral contract for an otherwise unlimited term cannot be brought within the one-year permissible period of section 5–701(a)(1) by a termination contingency that is exercisable only by the plaintiff." *Burke v. Bevona*, 866 F.2d 532, 537 (2d Cir.1989). Furthermore, a contract is not "performed" if it is breached. Therefore, if defendant's only right to terminate an oral contract within a year is triggered by plaintiff's breach, the contract is void under the statute of frauds. *D & N Boening, Inc. v. Kirsch Beverages, Inc.*, 63 N.Y.2d 449, 483 N.Y.S.2d 164, 167–68, 472 N.E.2d 992, 995–96 (1984). Plaintiffs claim the contracts were terminable only "for cause". Therefore, the question becomes whether the only "cause" contemplated by the parties was plaintiffs' breach of contract or whether defendants might have justified termination of the distributorships for reasons that did not constitute a breach by plaintiffs. The Second Circuit has held that one party may terminate a contract for a "just cause" that does not amount to a breach by the other party. *Ohanian v. Avis*

Dept.1976); *see Van Dussen–Storto Motor Inn, Inc. v. Rochester Telephone Corp.*, 63 A.D.2d 244, 407 N.Y.S.2d 287, 293 (4th Dept.1978). Therefore, for the reasons stated in part I above, we dismiss these claims for their failure to articulate an antitrust injury. *Original Appalachian Artwork, Inc. v. Granada Elec., Inc.*, 1986 WL 2402,

*Rent–A–Car System*, 779 F.2d 101, 107–08; *Wanamaker v. Columbian Rope Co.*, 740 F.Supp. 127, 136–37 (N.D.N.Y.1990); *see also Weiner v. McGraw–Hill, Inc.*, 57 N.Y.2d 458, 463, 457 N.Y.S.2d 193, 196, 443 N.E.2d 441, 444 (1982); *Buddman Distribs., Inc. v. Labatt Importers, Inc.*, 91 A.D.2d 838, 458 N.Y.S.2d 395, 396 (4th Dept.1982). However, we are mindful of the holding in *Burke*, 866 F.2d at 538 (citing the dissent in *Ohanian* with approval), that the termination provision must be expressed, not implied, to bring an oral contract within the statute of frauds' one-year period. Thus, we underscore that if it is shown that the only "cause" contemplated by the parties in the instant case was plaintiffs' breach of contract, then the contract will not be enforced against defendants. However, unless and until such evidence is presented to the court, we cannot find these contracts void under the statute of frauds. The publisher defendants' motion to dismiss the contract claims is denied.

### B. Tortious Interference with Contractual, Pre–Contractual, and Business Relationships

 Plaintiffs' twenty-second and twenty-sixth claims for relief allege tortious interference with plaintiffs' contractual and pre-contractual relations and tortious interference with plaintiffs' existing and prospective business relationships against NMDU, La Chance, Pelham, American, and Orlando. The latter three defendants move to dismiss the claims. Defendants argue that the tortious interference with contractual relationships claim should be dismissed because the contracts with which they are alleged to have interfered are void under the statute of frauds. Since the relevant contracts have not been shown to be void under the statute of frauds, defendants argument is without merit and their motion is denied. However, to state a claim for tortious interference with pre-contractual relationships, a plaintiff must allege that a contract would have been en-

*4 (S.D.N.Y.1986) (Donnelly Act and Clayton Act both require an antitrust injury); *International Television Productions Ltd. v. Twentieth Century–Fox Television*, 622 F.Supp. 1532, 1540 n. 10 (S.D.N.Y.1985) (same); *see Lerner Stores Corp.*, 381 N.Y.S.2d at 970 (Donnelly Act and Clayton Act require the same "standing to sue").

tered into had it not been for the malicious, fraudulent or deceitful actions of defendants. *CBS, Inc. v. Ahern*, 108 F.R.D. 14, 27 (S.D.N.Y.1985). The complaint in this case fails to state a claim for such a tort because it does not allege any contractual negotiations or expectations by plaintiffs with which defendants interfered.

 If plaintiffs are unsuccessful in establishing that they had an enforceable contractual relationship with the publisher defendants, they may still establish that La Chance, NMDU, Pelham, American, and Orlando tortiously interfered with plaintiffs' existing and prospective business relationships. To state a claim for tortious interference with an at-will business relationship, plaintiffs must claim malice or use of unlawful means by defendants. *NRT Metals, Inc. v. Laribee Wire, Inc.*, 102 A.D.2d 705, 476 N.Y.S.2d 335, 338 (1st Dept.1984). Plaintiffs' allegations of bribery and extortion are sufficient to support this claim.

## CONCLUSION

For the foregoing reasons the federal and state antitrust claims are dismissed along with the common law claim for tortious interference with pre contractual relations. However, the motion is denied as to the RICO claim and the other common law allegations.

SO ORDERED.