**VOLMAR DISTRIBUTORS, INC. and Interboro Distributors, Inc. d/b/a Media Masters Distributors, and Rez Associates, Inc., Plaintiffs,**

v.

**The NEW YORK POST CO., INC., Maxwell Newspapers, Inc., El Diario Associates, Pelham News Co. Inc., American Periodical Distributors, Inc., Vincent Orlando, Newspaper and Mail Deliverers Union of New York and Vicinity and Douglas La Chance, Defendants.**

No. 92 Civ. 2875 (WCC).

United States District Court, S.D. New York.

Sept. 22, 1995.

Sylvor, Schneer, Gold & Morelli, New York City (Iris S. Richman, of counsel), for plaintiffs.

Sipser, Weinstock, Harper & Dorn, New York City (Seth Kupferberg, of counsel), for defendant.

WILLIAM C. CONNER, Senior District Judge.

Plaintiffs Volmar Distributors, Inc. ("Volmar") and Interboro Distributors, Inc. ("Interboro") bring this action against The New York Post Co., Inc. (the "Post"), Maxwell Newspapers, Inc., publisher of *The Daily News,* (the "News"), and El Diario Assoc. ("El Diario"), (collectively the "Publisher Defendants"); Pelham News Co. Inc. ("Pel-

ham") and American Periodical Distributors, Inc. ("American"), (collectively the "Distributor Defendants"), and; Vincent Orlando ("Orlando"), the Newspaper and Mail Deliverer's Union (the "NMDU"), and Douglas La Chance ("La Chance") to contest plaintiffs' termination as distributors of *El Diario, The Daily News,* and *The New York Post.* The Fourth Amended Complaint asserts violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962, 1964, and state law claims for unfair competition and breach of contract. Defendant NMDU moves to dismiss the RICO and unfair competition claims asserted against it. For the reasons stated below, we grant its motion.

## BACKGROUND

The Post, the News, and El Diario are New York-based newspaper publishers. Volmar, Interboro, American and Pelham are independent, non-unionized newspaper distributors in the New York metropolitan area. Plaintiffs bring this action to contest the Distributor Defendants' termination of their *El Diario, The Daily News,* and *The New York Post* distribution contracts, which occurred in late 1991 and early 1992. The facts alleged in the Fourth Amended Complaint are as follows:

There are three principal methods by which newspapers are distributed in the New York area. First, the newspaper publishers own and operate trucks driven by unionized drivers. In addition, there are independent, unionized distributors and independent, non-unionized distributors, the latter of which service those parts of the market that lack sufficient volume or are too geographically remote to attract a unionized distributor. All relevant unionized newspaper distributors, both independent and publisher-owned, have collective bargaining agreements with the NMDU. The Distributor Defendants, non-unionized distributors such as plaintiffs, are owned and controlled by Orlando. Defendant La Chance also has a beneficial interest in these companies.

In 1991, La Chance was elected president of the NMDU. Sometime after he decided to run for office in 1990, he agreed with Orlando to use his position in the union to expand the business of the Distributor Defendants. To further this scheme, La Chance offered labor concessions to the Publisher Defendants in return for their agreement to cut off plaintiffs as distributors and award their distributorships to Pelham and American. In addition, La Chance threatened labor strife if the transfers were not made.

Subsequent to the Publisher Defendants' termination of them as distributors, plaintiffs filed the instant suit for federal and state antitrust violations, civil RICO violations, and various common law causes of action against the parties allegedly involved in the conspiracy to terminate their distributorships.[1] By order dated May 22, 1993, this Court upheld plaintiffs' RICO claims based on § 1962(c) & (d) against the Publisher and Distributor Defendants' motion to dismiss. *Volmar Distributors, Inc. v. New York Post, Inc.,* 825 F.Supp. 1153, 1169 (S.D.N.Y.1993). However, because neither La Chance nor the NMDU joined in that motion, the Court declined to address whether the allegations of the Second Amended Complaint at issue therein were sufficiently pled under Rule 9(b), Fed.R.Civ.P., as to those defendants. *Id.* at 1162. The NMDU now moves under Rules 9(b) and 12(b)(6) to dismiss both the RICO claim and the common law unfair competition claim asserted against it in the Fourth Amended Complaint.[2]

## DISCUSSION

On a motion to dismiss we must accept all allegations in the complaint as true, *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* ——— U.S. ———, ———, 113 S.Ct. 1160, 1161, 122 L.Ed.2d 517 (1993), and draw all reasonable inferences in favor of the plaintiff. *Walker v. City of New York,* 974 F.2d 293, 298 (2d Cir.1992), *cert. denied,* ——— U.S. ———, 113 S.Ct. 1387, 122

---

1. Plaintiffs since have withdrawn their federal and state antitrust counts against the defendants.

2. All references hereinafter to "the complaint" refer to the Fourth Amended Complaint unless otherwise specified.

L.Ed.2d 762 (1993). We will dismiss the action only if, from the face of the complaint, "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957).

## A. RICO

■ As to plaintiffs' RICO claim, the NMDU asserts 1) that it cannot be held liable for the actions of its former president La Chance under the RICO Act; 2) that plaintiffs have insufficiently pled predicate acts on which they base the NMDU's RICO violations, and; 3) that RICO claims against the NMDU are preempted by the Labor Management Relations Act (the "LMRA"), 29 U.S.C. §§ 141–187. We will address each of their arguments as necessary below.

Section 1962(c) prohibits any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, from conducting or participating, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity. 18 U.S.C. § 1962(c). Section 1962(d) prohibits a conspiracy to violate 1962(c). 18 U.S.C. § 1962(d). Plaintiffs contend that the NMDU violated these statutes[3] 1) by using the mails and wires to issue false and fraudulent statements in connection with the 1991 election of its officers that it would faithfully represent its membership's interests in violation of 18 U.S.C. §§ 1341, 1343; 2) by La Chance's direct or indirect acceptance of payments from the Publisher Defendants in the form of distribution rights and from the Distributor Defendants in the form of money and a beneficial interest in Pelham and American in violation of the Taft–Hartley Act, 18 U.S.C. § 186(a), (b), and; 3) by threatening labor strife if plaintiffs' distributorships went unterminated in violation of the Hobbs Act, 18 U.S.C. § 1951.

■ To sustain RICO liability under § 1692(c) against the NMDU, plaintiffs must allege that the union engaged in a "pattern of racketeering activity." While at a statutory minimum, this merely requires pleading at least two "predicate acts" of prohibited conduct within a ten year period, *see* 18 U.S.C. § 1961(5), in practice, plaintiffs must plead the commission of at least two predicate acts "that were related and that amounted to, or threatened the likelihood of, continued criminal activity." *H.J. Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). These "predicate acts" are defined as including specifically enumerated federal criminal offenses, such as mail fraud, wire fraud, Taft–Hartley Act violations, and Hobbs Act violations. 18 U.S.C. § 1961(1). Therefore, in assessing plaintiffs' RICO claims against the union, we must determine whether the alleged predicate acts (a) constitute proscribed racketeering activity; (b) if so, whether they are attributable to the union, and; (c) if so, whether the union thereby engaged in a pattern of racketeering activity.

### 1. Mail and Wire Fraud

Plaintiffs base their mail and wire fraud predicate claim against the NMDU on false statements that the NMDU communicated to its 4,000 members between December, 1990 through May, 1991, indicating that it would faithfully represent its membership. The NMDU argues that because plaintiffs fail to allege that these statements were made in furtherance of the alleged fraudulent scheme, they cannot predicate a RICO claim on violations of the mail or wire fraud statutes.

In our prior opinion, we held that plaintiffs had stated a valid predicate claim for mail and wire fraud against the NMDU based on those statements. *Volmar,* 825 F.Supp. at 1162. However, because the NMDU had not joined in that motion to dismiss, we did not specifically address the argument it raises now. After examining the complaint in light of the NMDU's contention, we agree with the

---

**3.** Although plaintiffs do not specify which subsection(s) of § 1962 that NMDU allegedly violated, in our prior opinion, we held that their Second Amended Complaint, containing substantially similar language to the instant complaint, stated

a valid claim under subsections (c) and (d) of the RICO statute. *Volmar,* 825 F.Supp. at 1161. We likewise find that plaintiffs' RICO claim against NMDU in the Fourth Amended Complaint hinges on those subsections.

NMDU that plaintiffs have failed to properly allege a claim for mail or wire fraud against it.[4]

To base a RICO claim on the violation of the mail fraud statute, plaintiffs must allege the existence of a fraudulent scheme and a mailing in furtherance of that scheme. *See Schmuck v. United States*, 489 U.S. 705, 712, 109 S.Ct. 1443, 1448, 103 L.Ed.2d 734 (1989). Although the defendant need not have personally mailed the letter, the plaintiffs must establish " '1) that the defendant 'caused the mailing' ... and 2) that the mailing was for the purpose of executing the scheme....' " *McLaughlin v. Anderson*, 962 F.2d 187, 191 (2d Cir.1992) (quoting *United States v. Bortnovsky*, 879 F.2d 30, 36 (2d Cir.1989)). Plaintiffs have failed to allege any facts to substantiate a claim that the NMDU mailing was made for the purpose of executing the fraudulent scheme.

In the complaint, plaintiffs assert that La Chance and Orlando initiated the conspiracy sometime after La Chance decided to run for election in 1990. Fourth Amended Complaint, at ¶ 49. However, plaintiffs do not allege that when the NMDU initiated the mailings in question, prior to La Chance's election, it was a party to the alleged scheme to drive plaintiffs from the distribution market. Mailings that occur before the accomplishment of a scheme has begun are outside the purview of the mail fraud statute. *United States v. Tarnopol*, 561 F.2d 466, 472 (3d Cir.1977). This is not so much a temporal restriction as it is a relatedness requirement. Because the NMDU became an instrument in the alleged scheme only after La Chance was elected, NMDU mailings occurring before that time, the mailings on which plaintiffs base their mail fraud claim, are not sufficiently related to the scheme to be actionable under the statute.

Stated another way, to establish that the alleged mailings occurred in furtherance of a fraudulent scheme, plaintiffs must allege NMDU's intent to defraud at the time that it initiated the mailings. *Laro, Inc. v. Chase*

*Manhattan Bank (Nat'l Ass'n)*, 866 F.Supp. 132, 137 (S.D.N.Y.1994), *aff'd*, 60 F.3d 810 (2d Cir.1995). As the Second Circuit has held: "A showing of intentional fraud ... or reckless indifference to the truth is necessary to satisfy the requisite knowledge and criminal intent element of mail fraud." *O'Malley v. New York City Transit Authority*, 896 F.2d 704, 706 (2d Cir.1990) (citations omitted). *See also Beck v. Mfgs. Hanover Trust Co.*, 820 F.2d 46, 49 (2d Cir.1987), *cert. denied*, 484 U.S. 1005, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988), *overruled on other grounds by United States v. Indelicato*, 865 F.2d 1370 (2d Cir.1989) (en banc); *Drexel Burnham Lambert v. Saxony Heights Realty*, 777 F.Supp. 228, 238 (S.D.N.Y.1991). On the other hand, "[a]cts done ... in good faith without an intent to defraud do not satisfy the requirements of the statute." *O'Malley*, 896 F.2d at 706. Plaintiffs have supplied no allegation that the NMDU mailings were intentionally fraudulent or that they resulted from a reckless indifference to the truth when they were mailed. Absent such allegations of intent, plaintiffs can not maintain a RICO claim based on mail fraud.

### 2. Taft–Hartley/Hobbs Act

██ Assuming *arguendo*, as we must on this motion, that the allegations against La Chance are true, plaintiffs have properly pled violations of the Taft–Hartley and Hobbs Act which constitute predicate acts for RICO purposes. As alleged, La Chance, a labor representative, accepted payments from the Publisher Defendants, an employer, that were offered with the intent of influencing La Chance with respect to his duties as an officer of the NMDU in violation of 29 U.S.C. § .186(a)(2), (4), (b)(1). Likewise, plaintiffs have properly alleged that La Chance used extortion to secure distribution rights for Pelham and American by threatening labor unrest if his demands were not met in violation of 18 U.S.C. § 1951(a), (b)(2). To establish the NMDU's liability for these predicate acts, however, plaintiffs must supply some basis for attributing these actions vicariously

---

4. Since the elements necessary to establish violations of both the mail and wire fraud statutes are essentially the same, we apply the identical analysis to both. *Carpenter v. United States*, 484 U.S. 19, 25 n. 6, 108 S.Ct. 316, 320 n. 6, 98 L.Ed.2d 275 (1987). Therefore, our reference to the mail fraud requirements is equally applicable to plaintiffs' wire fraud claims.

or otherwise to the union.[5] The proper inquiry, therefore, is whether La Chance's position within the NMDU was such that his alleged unlawful actions are attributable to the union.

Courts are in apparent agreement that the aim of RICO is to protect organizations from criminal infiltration, not to make them responsible parties. *See Laro*, 866 F.Supp. at 139. Under this principle, although the Second Circuit has apparently yet to address the issue, *see Pollack v. Laidlaw Holdings, Inc.*, 27 F.3d 808, 811 n. 2 (2d Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 425, 130 L.Ed.2d 339 (1994), this Court has declined to rely on *respondeat superior*, a no-fault liability scheme, as an appropriate basis for imposing civil liability under RICO. *Kahn v. Chase Manhattan Bank, N.A.*, 760 F.Supp. 369, 373 (S.D.N.Y.1991). The weight of authority in other circuits is in apparent agreement. *Id.* (citing cases).

On the other hand, notwithstanding the broad statement in *Kahn*, this Court has imposed RICO liability on a corporation for the actions of its employees when the corporation itself benefited from the scheme. *Center Cadillac, Inc. v. Bank Leumi Trust Co. of New York*, 808 F.Supp. 213, 236 (S.D.N.Y.1992). Still other courts have applied a "judicial gloss" to the RICO statute to hold that vicarious liability is appropriate only when the defendant organization can be characterized as the "central" or "controlling" figure in the RICO enterprise. *See Amendolare v. Schenkers International Forwarders, Inc.*, 747 F.Supp. 162, 168–69 (E.D.N.Y.1990); *Gruber v. Prudential–Bache Securities, Inc.*, 679 F.Supp. 165, 181 (D.Conn.1987). As the court in *Gruber* stated:

> ... a corporation may be found vicariously liable under Section 1962(c) only where the corporation may fairly be said to be a "central figure" (or "aggressor") in the

alleged scheme. What constitutes a central figure will vary with the factual circumstances of each case. In order to establish corporate liability under Section 1962(c), however, it is necessary to show that an officer or director had knowledge of, or was recklessly indifferent toward, the unlawful activity. Once knowledge or reckless indifference at this high corporate level has been determined, the court may then consider other factors, among them the number of high-level employees involved in the racketeering activity, their degree of participation in the racketeering activity, whether these high-level employees themselves committed the alleged predicate acts, and whether the corporation directly and substantially benefitted from the racketeering activity.

*Id.* (citation and footnote omitted). Finally, some courts have focused solely on general agency principles in imposing corporate liability. *Bernstein v. IDT Corp.*, 582 F.Supp. 1079, 1083 (D.Del.1984); *Amendolare*, 747 F.Supp. at 168–71 (analyzing union liability under scope of agency and apparent authority doctrines).

■ We agree with the general principle articulated in *Kahn* that corporations/unions are not automatically liable under RICO for the actions of their employees. Whether analyzed under agency principles or an amorphous "central figure" analysis, however, the relevant distinction between *Kahn* and *Center Cadillac* is the attribution of "fault" to the corporate entity. In *Kahn*, the scheme involved low level employees and the employer received no benefit from the scheme. *Kahn*, 760 F.Supp. at 372–73. On the other hand, *Center Cadillac* attributed liability to a bank when high level loan officers extorted money for the benefit of the bank. The ultimate question, therefore, is whether the NMDU, as opposed to merely La Chance, can be

---

**5.** Plaintiffs attempt to distinguish between direct and vicarious liability. *See* Plaintiffs' Memorandum in Opposition, at 2. However, as plaintiffs admit, "entities such as unions and corporations act only through their officers." *Id.* Therefore, in one sense corporations can never be directly liable, but only vicariously through the actions of their officers or employees. The relevant question in the instant case is whether the actions of La Chance are attributable to the NMDU. Whether such attribution is labeled as "direct" or "vicarious" is superfluous. Instead, the focus of this determination is on the theory that imputes liability, i.e. *respondeat superior* or general agency principles.

characterized as being at "fault" on the instant facts.

Without articulating the precise rule governing RICO liability for unions, we think that, at a minimum, to hold the NMDU at "fault" for the actions of its president on in this case, plaintiffs must allege some benefit to the union due to La Chance's illicit conduct. Such a requirement is consistent with the general policy behind RICO of punishing the criminals while protecting the innocent victims.[6] As this Court has previously stated, "[b]y its plain terms, RICO only imposes liability on corporations that benefit from the racketeering activity." *Banque Worms v. Luis A. Duque Pena E. Hijos, Ltda.,* 652 F.Supp. 770, 772 (S.D.N.Y.1986). Similarly, as *Center Cadillac* held, "[w]here the employer allegedly benefits from the predicate acts, respondeat superior liability under RICO is appropriate." *Center Cadillac,* 808 F.Supp. at 236. Therefore, derivation of benefit triggers the application of liability as long as imposing such liability does not conflict with the intent of Congress. *Liquid Air Corp. v. Rogers,* 834 F.2d 1297, 1306 (7th Cir.1987), *cert. denied,* 492 U.S. 917, 109 S.Ct. 3241, 106 L.Ed.2d 588 (1989).

Applying this principle to the instant case, because plaintiffs have failed to allege that the NMDU retained any benefits from La Chance's alleged Taft–Hartley and Hobbs Act violations, these acts are insufficient to impose RICO liability on the union. This case is remarkably similar to *Local 56, United Food & Commercial Workers Int'l Union v. Suzannah Farms,* No. 92–2930, 1993 WL 623316 (D.N.J. Aug. 17, 1993). In that case, the president of a union accepted bribes from a meat packing plant for keeping silent about unlawful practices at the plant and for securing labor concessions from the union. Noting that the union was merely a conduit for its president's misdeeds, not a beneficiary, the court held that the union was not itself involved in the racketeering enterprise nor could it be held vicariously liable for its president's actions. *Id.* at *4.

As in *Local 56,* plaintiffs herein supply no allegation that the union was more than a passive conduit for La Chance's alleged illegal conduct. Their complaint specifies no basis for concluding that La Chance was acting on behalf of the NMDU when he secured increased distribution rights for Pelham and American in exchange for labor concessions from the union and cites no involvement by other high level union officers. Nor do plaintiffs explain how the racketeering enterprise benefited the union as opposed to La Chance personally. Absent such allegations supported by competent evidence, plaintiffs cannot maintain a RICO claim against the NMDU.

Plaintiffs make three principal arguments for attributing liability to the union. First, plaintiffs assert vehemently that the NMDU should be held liable because it did receive substantial benefit from the scheme and/or because it ratified La Chance's unlawful actions through acquiescence. Under this argument, plaintiffs first assert that the NMDU's failure to disavow the illicit agreements entered into with the other defendants evidences the NMDU's interest in assisting La Chance personally and/or that it continues to benefit from the alleged RICO enterprise. Plaintiffs' Memorandum of Law in Opposition, at 5–6. While we agree that the NMDU's retention of benefits derived from the alleged scheme might trigger its liability in this case, *cf. Cox,* 17 F.3d at 1409, plaintiffs do not point to any agreements benefiting the NMDU that it has failed to disavow. The distribution contracts at issue are between the Publisher and Distributor Defendants and, as alleged in the complaint, do not involve the NMDU. Moreover, the mere fact that Pelham and American continue to

---

**6.** Some courts have argued that this principle has grown out of what has been labeled the non-identity rule and is inapplicable outside that context. *See, e.g., Cox v. Administrator United States Steel & Carnegie,* 17 F.3d 1386, 1409, *modified,* 30 F.3d 1347 (11th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 900, 130 L.Ed.2d 784 (1995). The non-identity rule states that, under the plain language of § 1962(c), a RICO claim must distin-

guish between the "enterprise" and the "person" conducting the enterprise in the prohibited manner. *Bennett v. United States Trust Co. of New York,* 770 F.2d 308, 315 (2d Cir.1985), *cert. denied,* 474 U.S. 1058, 106 S.Ct. 800, 88 L.Ed.2d 776 (1986). As articulated below, we feel that this policy survives irrespective of the identity of the person and enterprise.

operate plaintiffs' former distributorships, absent allegations that the NMDU has some control over who performs those operations, does not establish that the NMDU is a participant in the RICO enterprise through ratification. Plaintiffs fail to articulate how the NMDU has acquiesced in the illegal actions La Chance. Unless plaintiffs allege that the NMDU received and/or continues to receive benefits, economic or otherwise,[7] from La Chance's scheme, they cannot maintain a RICO claim against the NMDU predicated on La Chance's illicit acts.[8]

Next, citing an exhibit to an affidavit previously filed in this case, plaintiffs argue that payments made by Pelham to the former president of the NMDU in 1987 and 1988 evidence the NMDU's participation in and benefit from the scheme. Plaintiffs' Memorandum of Law in Opposition, at 6. We do not agree. First, because these allegations are not contained in the complaint we do not consider them pursuant to this motion to dismiss. The complaint merely alleges that prior to and conditioned upon La Chance's election as president of the NMDU, La Chance and Orlando agreed to institute the alleged scheme. Fourth Amended Complaint at ¶ 49. Second, even if these allegations were made in the complaint, they do not establish, by themselves, that the NMDU benefited from the alleged scheme. The fact that the NMDU's former president also received illegal payments does not automatically impute liability to the NMDU.

Plaintiffs also point to allegations contained in their Second Amended Complaint that defendants made payments to the NMDU welfare and pension funds as evidence of NMDU's benefit from the conspiracy. Plaintiffs' Memorandum in Opposition, at 3 n. 1. However, we previously ruled that because plaintiffs did not allege that these payments had any connection with the scheme to eliminate plaintiffs from the distribution market, they had no standing to base a RICO suit on these acts. *Volmar*, 825 F.Supp. at 1165 & n. 18. We stand by that holding. Moreover, because these allegations are not contained in the complaint at issue on this motion, we decline to consider them.

Finally, plaintiffs contend that by eliminating them from the distribution business, La Chance and the NMDU have consolidated non-union employers thereby benefiting the union. They claim that the NMDU and its former officers have previously conceded this allegation. Whether or not the NMDU has previously made such an argument in other contexts, the benefits to the NMDU from consolidation are marginal at best and plaintiffs do not contend otherwise in the complaint. The complaint indicates that the unionized and non-unionized distributors do not directly compete with each other. Fourth Amended Complaint, at ¶ 35. Moreover, even if they do compete, diverting distributorships between non-unionized distributors would seemingly have no effect on the unionized distributors or the union's presence in the distribution market. Absent allegations, e.g., that consolidation favorably affects the NMDU's position in the distribution market, plaintiffs have failed to establish a

---

**7.** Plaintiffs rely on *Nat'l Org. for Women, Inc. v. Scheidler*, ⸺ U.S. ⸺, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994) for the proposition that liability under § 1962(c) can be predicated on acts that have no economic motive. That case did not address the circumstances under which an employee's actions are attributable to his employer under RICO. Moreover, we agree that to impose liability, the NMDU need not have received any "economic" benefit as long as the conduct furthered its concerns and goals. Plaintiff has alleged no such benefit herein, however.

**8.** We decline to hold that even absent a benefit, the NMDU can be held liable for acquiescing in the fraudulent scheme. Although agency law does recognize that failure to repudiate can act as an affirmance of an unauthorized transaction,

*see* Restatement (Second) of Agency § 94 (1958), we do not think that this doctrine should be used to undermine the federal policy of punishing only culpable RICO parties. Moreover, we question whether the NMDU's failure to discipline La Chance, standing alone, is sufficient acquiescence to warrant imputing La Chance's unlawful acts to the NMDU. *See* Restatement (Second) of Agency § 94, cmt. d (1958). While there might be some circumstance when multiple officers of a principal are so involved in a RICO enterprise and in attempts to cover up the principal's involvement that, even if the principal received no benefit from the conspiracy, it can be held liable through acquiescence, we do not think that the instant facts warrant such a conclusion.

real benefit to the union based on consolidation.

As a second argument, plaintiffs rely on *Amendolare,* 747 F.Supp. at 168–69, in contending that either because the NMDU and its policies were at the heart of the conspiracy or because La Chance had "apparent authority" from the union to perform the alleged illegal acts, the NMDU can be liable under RICO even if it received no benefits from the scheme.

First, plaintiffs contend that because La Chance used the threat of strikes to carry out his scheme and because others within the union participated in covering up the scheme, the NMDU can be held liable for RICO purposes. While we agree that La Chance utilized his position as president of the NMDU to secure his personal gains, and that therefore the union was an essential element in the conspiracy, absent allegations that the NMDU received any benefits from the scheme we feel the union was, like plaintiffs, a victim not an aggressor. Moreover, the allegations that the current NMDU president Frank Saparacino participated in the conspiracy are not contained in the complaint and as such we do not consider them pursuant to this motion to dismiss. The complaint merely alleges that La Chance and Orlando concocted a scheme to drive plaintiffs from the distribution market, without mentioning other NMDU officers. Fourth Amended Complaint, at ¶ 49. Although participation of multiple officers of the union and efforts by them to cover up the union's involvement might weigh against characterizing the NMDU as an innocent victim, on the instant facts, plaintiffs have not alleged sufficient involvement by high ranking union officials to overcome the fact that the union itself received no benefit.

Plaintiffs' reliance on the doctrine of apparent authority is equally unavailing. In *Amendolare,* the union-member plaintiffs were laid off by their employers under an agreement between the union president and the employers to reduce the work force in exchange for payments to union officials. The court, finding that the union received no benefit from the scheme, held that the president's unlawful actions were not within the

scope of his employment and could not be attributable the union under that principle. *Amendolare,* 747 F.Supp. at 170. However, because the president and other officials had sanctioned the plaintiffs' dismissals and later indicated to the plaintiffs that there were no new employment opportunities, the court held that the union could be found liable under the doctrine of apparent authority. The court relied on Restatement (Second) of Agency § 261, comment a which states:

> [L]iability is based upon the fact that the agents' position facilitates the consummation of the fraud, in that from the point of view of the third person the transaction seems regular on its face and the agent appears to be acting in the ordinary course of the business confided to him.

Unlike *Amendolare,* wherein the plaintiffs relied on the authority of their union president, in the instant case plaintiffs do not allege that La Chance took any action with respect to them that gave them the impression that his actions were within the ordinary course of business confided to him. To the contrary, plaintiffs had no dealings with La Chance or the NMDU whatsoever. This lack of reliance on the apparent authority of La Chance undermines application of that doctrine as to them. *Banque Worms,* 652 F.Supp. at 773. Therefore, without deciding viability of this doctrine under RICO in general, we decline to invoke it on the instant facts.

Finally, as a third argument, plaintiffs rely on *Cox v. Administrator U.S. Steel & Carnegie,* which concluded that "the RICO exception to the application of vicarious liability is a narrow one, created to preserve the non-identity [of the RICO 'person' and 'enterprise'] rule, and it therefore protects only those employers who are also the RICO enterprise for purposes of § 1962(c)." *Cox,* 17 F.3d at 1406. In that case, the Eleventh Circuit distinguished those cases which held vicarious liability inapplicable in RICO cases on the grounds that they stem solely from a preservation of the non-identity rule. The court then noted that because it had previously rejected the non-identity rule, those

cases were inapplicable under its analysis.[9] *Id.* at 1406.

■ In *Kahn,* this Court squarely rejected the Eleventh Circuit's above characterization of the law. *Kahn,* 760 F.Supp. at 373 n. 3. We agree with that reasoning. Moreover, whether or not those cases refusing to hold corporations that do not benefit from racketeering activity liable under RICO ultimately rely on the non-identity rule, courts within this circuit have adopted that principle and we find persuasive. *Laro, Inc. v. Chase Manhattan Bank (Nat'l Assn.),* 866 F.Supp. 132, 133 (S.D.N.Y.1994) (refusing to apply liability to bank under § 1962(c) for actions of employee absent allegation that bank benefited from scheme); *Metro Furniture Rental, Inc. v. Alessi,* 770 F.Supp. 198, 202 (S.D.N.Y.1991) (refusing to apply no-fault liability to bank under § 1962(c) for actions of employee); *Kahn,* 760 F.Supp. at 373 (refusing to apply no-fault liability to bank under § 1962(c) for actions of employee); *Banque Worms,* 652 F.Supp. at 773 (refusing to apply no-fault liability to shipping company under § 1962 for actions of employee even if "person" and "enterprise" are distinct); *In re Citisource, Inc. Securities Litigation,* 694 F.Supp. 1069, 1080 (S.D.N.Y.1988) (refusing to apply no-fault liability to city under § 1962(c) for actions of employees); *Intre Sport Ltd. v. Kidder, Peabody & Co.,* 625 F.Supp. 1303, 1309, *aff'd,* 795 F.2d 1004 (2d Cir.1986) (refusing to apply no-fault liability to brokerage firm under § 1962(c) for actions of broker).[10] Even those courts that have applied vicarious liability under § 1962(c) have required a showing that the "employer/enterprise actually benefitted from the persons' predicate acts." *Connors v. Lexington Ins. Co.,* 666 F.Supp. 434, 453 (E.D.N.Y. 1987). Therefore, while vicarious liability under § 1962(c) is not completely foreclosed, it should be reserved for "aggressor" entities

which serve as the central figures in the unlawful scheme rather than mere "conduit" organizations. *See Amendolare,* 747 F.Supp. at 168. To the extent that *Cox* holds otherwise, we decline to follow it.

Moreover, even if we were to agree with *Cox,* our holding would not change. *Cox* imputed liability to a union based on a finding that its representatives committed illegal acts: 1) within the course of their employment; 2) in furtherance of the business of the union; 3) which were subsequently authorized by the union through its acquiescence. *Cox,* 17 F.3d at 1407. In addition, *Cox* found that even if the union representatives acted outside their authority, the union could be liable for failing to repudiate the unauthorized acts. *Id.* at 1409.

In the instant case, the allegations contained in the complaint do not support a reasonable finding that La Chance's actions were committed in furtherance of the business of the union. *See Amendolare,* 747 F.Supp. 162 (lack of benefit to union prevented liability based on scope of employment doctrine); *Local 56,* at *3. Instead, the complaint indicates that La Chance orchestrated the scheme solely for his and Orlando's benefit. Similarly, as we articulated above, plaintiffs supply no allegations from which to conclude that the NMDU authorized or subsequently ratified his actions through acquiescence. In addition, since the NMDU receives no benefit from plaintiffs' ouster from the distribution market, their failure to repudiate the scheme does not transform their status into that of an aggressor. Absent allegations that the NMDU benefited from the alleged scheme, plaintiffs may not maintain a RICO claim under § 1962(c) or (d)

9. The Second Circuit, on the other hand, has adopted the non-identity rule. *Bennett,* 770 F.2d at 315; *but see Cullen v. Margiotta,* 811 F.2d 698, 729–30 (2d Cir.), *cert. denied,* 483 U.S. 1021, 107 S.Ct. 3266, 97 L.Ed.2d 764 (1987) (single entity can be a person and one of a number of members of the RICO enterprise).

10. While admittedly, unlike the present case, many of these cases involve an identity between the "enterprise" and the "person," and most

involve low level employees, we think that the congressional policy of holding only culpable "persons" liable under RICO supplies the ultimate rationale for the non-identity rule and applies irrespective of an identity between the person and the enterprise. *See Bennett,* 770 F.2d at 315 (noting that non-identity rule comports with the congressional intent of punishing criminals not victims).

against the NMDU based on La Chance's alleged unlawful acts.[11]

## B. Unfair Competition

■ Plaintiffs also bring a claim for unfair competition under New York law against the NMDU for misappropriating "the good will, supplier relationships and customer relationships which the plaintiffs had painstakingly built through their own efforts and which together comprise the plaintiffs' property interest in their wholesale newspaper distribution business...." Fourth Amended Complaint, at ¶ 116. The NMDU moves to dismiss this claim for failing to allege that it misappropriated any "property" owned by the plaintiffs.[12] The NMDU supports this contention by pointing out that it is not a competitor of the plaintiffs.

Under New York law, courts have recognized that the tort of unfair competition is "adaptable and capacious," *Roy Export Co. Establishment of Vaduz, Liechtenstein v. Columbia Broadcasting System*, 672 F.2d 1095, 1105 (2d Cir.), *cert. denied*, 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982), and noted that it serves to police "any form of commercial immorality." *Metropolitan Opera Ass'n v. Wagner–Nichols Recorder Co.*, 199 Misc. 786, 796, 101 N.Y.S.2d 483, 492 (N.Y.Sup.Ct.1950), *aff'd*, 279 A.D. 632, 107 N.Y.S.2d 795 (N.Y.App.Div.1951). Given the broad aims of the tort law, courts have agreed that it proscribes "misappropriati[ng] for the commercial advantage of one person ... a benefit or 'property' right belonging to another." *Id.* at 793, 101 N.Y.S.2d at 489; *Greenblatt v. Prescription Plan Services Corp.*, 783 F.Supp. 814, 825 (S.D.N.Y.1992) ("essence of tort is the effort to misappropriate the fruits of another's efforts."); *see also Int'l News Service v. Associated Press*, 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211 (1918).

Plaintiffs rely principally on this misappropriation theory to support their claims against the NMDU. In their complaint, however, they make no allegation that the NMDU has misappropriated the benefits from any 'property' right owned by plaintiffs.[13] Not only does the NMDU not compete with plaintiffs, the complaint specifies no benefit that the NMDU received due the termination of plaintiffs' distributorships. The NMDU is not utilizing plaintiffs' good will, supplier relationships, and customer relationships, nor is it receiving any benefit from others' use of those alleged 'property' rights. Therefore, while in one sense, if La Chance's alleged actions are attributed to the NMDU, its conduct could be described as "commercially immoral," the allegations do not satisfy the traditional requirements for recovery under the misappropriation rubric of unfair competition law.

Plaintiffs cite no case law whatsoever extending the unfair competition tort to the instant facts under a misappropriation theory and we are not aware of any. While admittedly the tort is not restricted to redressing only competitive injuries, *Dior v. Milton*, 9 Misc.2d 425, 434, 155 N.Y.S.2d 443, 455 (Sup. Ct.), *aff'd*, 2 A.D.2d 878, 156 N.Y.S.2d 996 (App.Div.1956), and has been described as "amorphous," as a federal court exercising supplemental jurisdiction over this claim, it is not our role to undertake an expansion of New York law. *H.L. Hayden Co. of New York, Inc. v. Siemens Medical Systems, Inc.*,

---

**11.** Because we dismiss plaintiffs' RICO claim against the NMDU on pleading grounds, we do not address, at this time, the NMDU's additional argument that the RICO statute is preempted by the LMRA.

**12.** The NMDU also moves to dismiss the unfair competition claim for lack of subject matter jurisdiction in light of our dismissal of the RICO claim, the claim upon which our original jurisdiction is based under 28 U.S.C. § 1331. The NMDU apparently contends that dismissal of the sole federal claim against a party also warrants dismissal of all pendent state claims against that party. *See Finley v. United States*, 490 U.S. 545, 109 S.Ct. 2003, 104 L.Ed.2d 593 (1989). In

1990, however, Congress granted the district courts supplemental jurisdiction over common law claims against parties, even if no federal claim is asserted against them, as long as they are related to claims over which the court has jurisdiction. *See* 28 U.S.C. § 1367(a). Given this change in the law, we decline to dismiss the unfair competition claim on jurisdictional grounds.

**13.** Plaintiffs do claim that El Diario fraudulently obtained their distribution lists. Fourth Amended Complaint, at ¶ 110(f). However, plaintiffs do not allege that the NMDU was involved in this aspect of the alleged scheme or that the NMDU utilized those lists to its commercial advantage.

879 F.2d 1005, 1025 (2d Cir.1989). Moreover, as the Second Circuit has recognized, "such an amorphous cause of action is capable of mischievous application...." *Roy Export*, 672 F.2d at 1105. Therefore, because plaintiffs have failed to allege that the NMDU has misappropriated any of their rights or benefited from their misappropriation by others, we dismiss plaintiffs' claim for unfair competition against the union.

## CONCLUSION

Plaintiffs' seventeenth cause of action for violation of the RICO Act and eighteenth cause of action for unfair competition are dismissed as against the NMDU. However, because plaintiffs' reference to materials not outlined in the complaint suggests that they may be able to allege facts supporting a claim against the NMDU for vicarious liability based on the actions of its president, plaintiffs may apply at a pre-motion conference before the Court for leave to file an amended complaint alleging such facts.

SO ORDERED.